Affirmed and Memorandum Opinion filed June 10, 2004









Affirmed and Memorandum Opinion filed June 10, 2004.

 

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00024-CV

____________

 

IN THE INTEREST OF
J.H.W., A CHILD

 

 



 

On Appeal from the 247th
District Court

Harris County, Texas

Trial Court Cause No. 99-11781

 



 

M E M O R A N D U M   O P I N I O N








Bettye Ruth Johns-Adams appeals the trial
court=s order modifying
the parent-child relationship and appointing Joe H. Williams as joint managing
conservator with the right to establish the residence of their child,
J.H.W.  In four issues, Johns-Adams
claims the trial court abused its discretion in changing primary custody of the
child from the mother to the father and contends there was no evidence or insufficient
evidence to support the trial court=s findings that
(1) the change of custody was in the best interest of the child; (2) the child=s then-present
environment may have endangered the child=s physical health
or significantly impaired the child=s emotional
development; and (3) the circumstances of the child or of the parties had
materially and substantially changed since the rendition of the last order to
modify.  In two additional issues,
Johns-Adams contends the trial court erred in (1) ordering Johns-Adams to pay
Williams for attorney=s fees incurred in connection with a
post-judgment motion for contempt, and (2) denying a post-judgment motion to
change venue.  We have no jurisdiction to
consider these last two post-judgment issues. 
We affirm the trial court=s order to modify.

Background

Johns-Adams and Williams are the natural
parents of J.H.W.  On April 21, 1997, the
trial court entered a decree of paternity, which set forth orders affecting the
parent-child relationship.  The parties
were named joint-managing conservators and Johns-Adams was named as the primary
joint-managing conservator with the right to establish the residence of the
child.  The trial court entered an order
to modify the parent-child relationship on October 9, 2000, which changed the
place of exchange of the child, added certain parental notifications, and
affirmed the previous provisions regarding conservatorship.  On November 9, 2000, Williams filed a motion
to modify, requesting that he be appointed sole-managing conservator.  After a bench trial, the trial court signed
an order modifying the parent-child relationship on April 26, 2002.[1]  The trial court did not appoint Williams as
sole-managing conservator, but did appoint him as the primary joint-managing
conservator with the right to establish the residence of J.H.W. and ordered
Johns-Adams to pay child support.[2]

 

 








The Order to Modify

In her first four issues, Johns-Adams
claims the trial court abused its discretion in changing primary custody of the
child from the mother to the father and contends there was no evidence or the
evidence was insufficient to support the trial court=s findings with
regard to what was in the best interest of the child, whether the child=s then-present
environment may have endangered the child, and whether the circumstances of the
child or of the parties had materially and substantially changed since the
rendition of the last modification order. 

A trial court=s order modifying
conservatorship will not be disturbed on appeal unless the complaining party
establishes a clear abuse of discretion. 
Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982); In re
P.M.B., 2 S.W.3d 618, 621 (Tex. App.CHouston [14th
Dist.] 1999, no pet.).  A trial court
abuses its discretion when its ruling is arbitrary, unreasonable, or without
reference to any guiding rules or legal principles.  K‑Mart Corp. v. Honeycutt, 24
S.W.3d 357, 360 (Tex. 2000).  The fact
that a trial judge may decide a matter within its discretionary authority
differently than the reviewing court in similar circumstances does not
establish an abuse of discretion.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 242 (Tex. 1985).  The trial court does not abuse its discretion
as long as some evidence of a substantive and probative nature exists to
support the trial court=s decision.  In re C.R.O., 96 S.W.3d 442, 447 (Tex.
App.CAmarillo 2002,
pet. denied).








Under the abuse-of-discretion standard,
the legal and factual sufficiency of the evidence are not independent grounds
of error, but are merely factors in assessing whether the trial court abused
its discretion.  Beaumont Bank, N.A.
v. Buller, 806 S.W.2d 223, 226 (Tex. 1991); Zieba v. Martin, 928
S.W.2d 782, 786 (Tex. App.CHouston [14th
Dist.] 1996, no writ).  We review a trial
court=s findings for
factual sufficiency by the same standards used in reviewing jury answers.  Ortiz v. Jones, 917 S.W.2d 770, 772
(Tex. 1996).  We consider all the
evidence and set aside the findings only if they are so contrary to the
overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.  Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986).  In determining a Ano‑evidence@ issue, we are to
consider only the evidence and inferences that tend to support the finding and
disregard all evidence and inferences to the contrary.  Bradford v. Vento, 48 S.W.3d 749, 754
(Tex. 2001).  Anything more than a
scintilla of evidence is legally sufficient to support the finding.  Leitch v. Hornsby, 935 S.W.2d 114, 118
(Tex.1996).  More than a scintilla of
evidence exists if the evidence furnishes some reasonable basis for differing
conclusions by reasonable minds about the existence of a vital fact.  Rocor Int=l, Inc. v. Nat=l Union Fire Ins.
Co.,
77 S.W.3d 253, 262 (Tex. 2002).  In
reviewing an Ainsufficiency@ issue, we are
required to consider all of the evidence in the case and determine whether the
finding is so weak or the evidence to the contrary is so overwhelming that the
finding should be set aside and a new trial ordered.  Maritime Overseas Corp. v. Ellis, 971
S.W.2d 402, 406B07 (Tex.), cert. denied, 525 U.S.
1017 (1998). 








A trial court may modify an order in a
suit affecting the parent-child relationship if it would be in the best
interest of the child and the circumstances of the child or of the parents have
materially and substantially changed since the date of the last modification
order.  Tex.
Fam.Code Ann. ' 156.101(1) (Vernon 2002).[3]  If a modification is sought within a year of
the last conservatorship order, the trial court must also determine that the
child=s present
environment may endanger the child=s physical health
or significantly impair the child=s emotional
development.  Tex. Fam.Code Ann. ' 156.102(a).  In this case, the trial court determined that
the circumstances of the child or parents had materially and substantially
changed since the date of the rendition of the prior order, J.H.W.=s then-present
environment in the home with Johns-Adams may have endangered his physical
health or significantly impaired his emotional development, and it was in the
best interest of J.H.W. that the father be awarded the exclusive right to
establish the child=s primary residence.

As a threshold issue, Johns-Adams contends
there is no evidence or insufficient evidence to support a finding that the
circumstances of the child or of the parties had materially and substantially
changed between October 16, 2000, the date of the last conservatorship order,
and November 9, 2000, the date Williams filed his motion to modify.  Williams testified that between October 9,
2000, and the day he filed his motion to modify, he and Johns-Adams had a
conversation about J.W.H.=s well being.  Williams told Johns-Adams he was concerned
about the child being in a day care rather than in a pre-school and discussed
some of the child=s developmental delays.  Johns-Adams told him that she made the
educational decisions for the child.  She
also told him that if he filed for custody of their child, she would kill
herself and the child.  Williams said he
took this threat seriously because Johns-Adams had been under psychological
care.  Moreover, Johns-Adams had taken an
overdose of sleeping pills in 1997 and told Williams in 1998 that she had
attempted suicide again.  Johns-Adams
argues that, because her two previous attempts or threats of suicide came
before the entry of the last modification order, the alleged threat that
occurred after October 9 was not a changed circumstance, but a continuing
circumstance. 

          The question of whether a material and
substantial change of circumstances has occurred lies within the sound
discretion of the trial court.  Gillespie,
664 S.W.2d at 451.  Further, a trial
court=s determination as
to whether a material change of circumstance has occurred is not guided by
rigid rules and is fact-specific.  In
the Interest of Z.B.P. and J.N.P., 109 S.W.3d 772, 779 (Tex. App.CFort Worth 2003, no pet.).  Johns-Adams cites no authority for the
proposition that, under the circumstances, the threat is insufficient as a
matter of law to support the trial court=s finding, and we
have found none.  We find the evidence is
both legally and factually sufficient to support the trial court=s finding of a
material and substantial change in circumstances.  








However, as in all suits regarding the
conservatorship of a child, the court=s primary
consideration Ashall always be the best interest of the
child.@  Tex.
Fam.Code Ann. ' 153.002; In re V.L.K., 24 S.W.3d
338, 342 (Tex. 2000).  A court  may use the nonexhaustive list of Holley factors
to determine the child=s best interest.  Holley v. Adams, 544 S.W.2d 367, 371‑72
(Tex. 1976).  Those factors include, but
are not limited to: (1) the desires of the child; (2) the emotional and
physical needs of the child now and in the future; (3) the emotional and
physical danger to the child now and in the future; (4) the parental abilities
of the individuals seeking custody; (5) the programs available to assist these
individuals to promote the best interest of the child; (6) the plans for the
child by these individuals or by the agency seeking custody; (7) the stability
of the home or proposed placement; (8) the acts or omissions of the parent,
which may indicate that the existing parent‑child relationship is not a
proper one; and (9) any excuse for the acts or omissions of the parent.  Id. at 371B72.  These considerations are not exhaustive.  In re C.H., 89 S.W.3d 17, 27 (Tex.
2002).  In the context of custody
modification, other factors to be considered include the child=s need for
stability and the need to prevent constant litigation in child-custody
cases.  V.L.K., 24 S.W.3d at 343.

At trial, Williams and Johns-Adams
testified, as did J.H.W.=s kindergarten teacher, Williams=s fiancée, and
friends and family members of Johns-Adams. 
In addition to testifying about Johns-Adams=s threat, Williams
discussed his concerns about the child=s educational and
developmental delays.  Williams said
that, at the age of five, J.H.W. was not able to brush his teeth, was not able
to bathe himself without assistance, would eat standing up rather than sitting,
used his shirt to wipe his mouth instead of napkins, and had to be instructed
on the use of utensils.  When J.H.W. was
eventually enrolled in first grade, he was sent back to kindergarten because of
his delays.  Johns-Adams failed to give
Williams information about what school J.H.W. attended, but he found out by
conducting an internet search of the school district in the area of Johns-Adams=s residence.  Williams had been contacted by the school
about eight to ten times since J.H.W. started kindergarten.  








Anne Marie Manning, J.W.H.=s kindergarten
teacher, confirmed that he had been moved from the first grade to kindergarten
because of performance issues.  Manning
said J.H.W. did not have the skills that even kindergartners usually come to
school with.  When he entered her class
in the fall of 2001, he could not say his ABCs, write his name, understand the
sounds of letters, count beyond ten, or recite his birth date, address, or
telephone number.  Manning confirmed that
Williams had been contacted about the child=s behavior at
least seven times since he started kindergarten.  Manning attempted to contact Johns-Adams
about J.H.W.=s assessment level at the beginning of the
school year, but Johns-Adams did not come in until October.  Williams had contacted the principle and left
a message for Manning before the first day of class.  In January of 2002, Manning placed J.H.W. on
at-risk status, which involves private tutoring and the entry of a contract
with the parents.  In the nine weeks
prior to trial on the motion to modify, J.H.W. had made significant
improvement. 

Williams tried to help his child improve
his skills and had asked Johns-Adams to do the same.  Based on his conversations with the child,
Williams did not believe that Johns-Adams was reinforcing the skills.  Williams thought his son was accustomed to
watching an excessive amount of television, because during visitation periods
J.H.W. would sit in front of the television all day long if permitted without
concern for eating or anything else.

Since October of 2000, Williams has
experienced problems with Johns-Adams at least three times at the start or end
of his periods of visitation.  On one
occasion in particular, Johns-Adams told Williams, in the child=s presence, that
she was going to kill Williams.  The
teen-aged daughter of Johns-Adams began kicking Williams=s vehicle, and Williams
had to call the police to get his son. 
Williams said that Johns-Adams has said things to make the child cry and
has used vulgarity and displayed anger at him in the presence of the child.  Johns-Adams also made harassing phone calls
to Williams=s fiancée. 









Williams said J.H.W. does not want to
return to Johns-Adams at the end of his possessory periodsCWilliams has had
to physically take his son out of his car to return the child to his mother and
the child has fallen to the ground to indicate he does not want to go home with
his mother.  Williams objected to
Johns-Adams allowing her teen-aged daughter to drive J.H.W. to the place of
exchange, which means the teenager drives the child to and from Houston and
Centerville.  Williams admitted he had
not been able to exercise all of his scheduled visitation since October of 2000
because the child was sick, and had placed the child in daycare during part of
the summer vacation J.H.W. spent with him. 

Williams described a typical weekend with
his son, which included having breakfast together, going for haircuts, going
outside to play different games, and then working on the child=s reading skills
and doing flash card work.  Williams
tried to spend as much time as possible with his son to make sure J.H.W. had a
well-rounded and balanced life.  Williams
said he would have the necessary time to take care of J.H.W.=s needs because as
an insurance agent, although he generally works from 9:00 a.m. to 5:00 p.m.,
his schedule is flexible.  He planned a
more structured life for J.H.W. with regard to study time and bed time.  Williams would wake the child in the
mornings, feed him, dress him, and take him to school.  Williams hoped to place J.H.W. in private
school, and if needed, would seek extra tutoring for the child.  Williams conceded he lives with his fiancée,
Michelle Wade, and was aware that a prior order of the court prohibited
overnight guests while the child was in his possession.  Williams and Wade delayed plans to marry
during this custody case, but planned to marry in July of 2002.  Williams described the relationship between
Wade and his son as wonderful.  Wade
spends time with J.H.W. reading and helping him with flash cards.  Williams saw nothing wrong with his living
arrangement, did not think it was harmful to the child, and said it had been a
positive improvement for the child because of Wade=s influence and of
the relationship between J.H.W. and Wade=s child. 








Wade discussed harassment charges she
filed against Johns-Adams due to Johns-Adams=s calling her
home, going to her daughter=s school, calling
her place of employment, and calling various family members.  Johns-Adams pleaded guilty to the charges and
was placed on one-year=s probation.  The probation was extended two more months
due to a courthouse altercation that occurred while this case was pending.  Wade heard a telephone message left for
Williams by Johns-Adams in which she threatened to kill Williams.  Wade said that J.H.W. has had emotional
outbursts when he returns to his mother=s custody. 

Johns-Adams testified at the trial and
disputed most of Williams=s testimony.  She denied ever attempting suicide or
threatening to kill herself or the child after the last order to modify had
been entered in October of 2000.  She
admitted to the previous suicide event in 1998, but explained that she had not
really taken the sleeping pillsCshe had only
claimed to do so to see Williams.  She
also denied ever threatening to kill Williams. Johns-Adams contended it was not
in the best interest of J.H.W. to be with Williams.  She said that Williams refused to give the
child asthma medication when he had possession of the child and that the child
hated going to visit Williams.  She also
contends that Williams=s living situation is inappropriate and
violates a previous court order regarding cohabitation.[4]  

Johns-Adams said she has helped with
J.H.W.=s classwork, and
was gratified that J.H.W. had shown improvement.  She asked Manning to make a tape of J.H.W.=s numbers and his
alphabets and their sounds and said that when she comes home the first thing
they do is go over the tape and do their drills.  At the time of trial, Johns-Adams worked
three days a week at Sam=s Club and baby-sat five kids after
school.  Johns-Adams also called friends
and family to testify on her behalf.  Her
daughter and son from previous relationships testified that she was loving
toward J.H.W.  Her daughter said
Johns-Adams and J.H.W. worked together on the tapes prepared by Manning.  Her son and other family and friends also
said that Johns-Adams was a wonderful mother, who took great care of the
child.  There was varying testimony about
whether the child had flash cards at his mother=s home.








Although the trial court heard
contradictory testimony about events that had occurred between the parties and
about what would be in the best interest of J.H.W., the question of
conservatorship of a child is left to the sound discretion of the trial court
when it sits as a trier of fact.  Jenkins
v. Jenkins, 16 S.W.3d 473, 477 (Tex. App.CEl Paso 2000, no
pet.).  The trial court is in the best
position to Aobserve the demeanor and personalities of
the witnesses and can >feel= the forces,
powers, and influences that cannot be discerned by merely reading the record.@  Id. 
A review of the record establishes that the evidence is legally and
factually sufficient to support the trial court=s findings.  Therefore, the trial court did not abuse its
discretion in appointing Williams as the primary joint-managing conservator
with the right to establish the residence of the child.  We overrule Johns-Adams=s first three
issues.

The Post-Judgment Rulings








In her fifth and sixth issues, Johns-Adams
contends the trial court erred in (1) ordering Johns-Adams to pay Williams for
attorney=s fees incurred in
connection with a post-judgment motion for contempt, and (2) denying a motion
to change venue filed in connection with another post-judgment motion for
contempt.  The trial court entered its
order on the Motion to Revoke Suspension of Commitment, which awarded Williams
attorney=s fees, on October
15, 2003.  The trial court entered its
order on the Motion to Transfer Venue on November 11, 2003.[5]  Johns-Adams filed her notice of appeal in
this case on April 22, 2002, and her amended notice of appeal on January 15,
2003.  Both notices specifically sought
review of the order to modify.  Neither
notice identified the October 15, 2003 or November 11, 2003 orders as subjects
of appellate review nor can we find that these orders would have been subsumed
into the previously-entered order to modify. 
See Tex. R. App. P.
25.1(d)(2) (requiring that appellant Astate the date of
the judgment or order appealed from@ in order to
properly perfect her appeal); see also In the Interest of T.J.L., 97
S.W.3d 257, 262 (Tex.
App.CHouston [14th Dist.] 2002, pet.
denied) (finding that an interlocutory motion to transfer venue becomes merged
into a subsequent, final, appealable order and need not be identified
separately in the notice of appeal as long as the notice identifies the subsequent
order into which the motion to transfer has been merged).  Accordingly, we do not have jurisdiction to
consider Johns-Adams=s fifth and sixth issues.

Having overruled or disposed of all of
appellant=s issues, we affirm the trial court=s judgment.

 

 

 

 

/s/      Leslie Brock Yates

Justice

 

 

 

 

Judgment
rendered and Memorandum Opinion filed June 10, 2004.

Panel
consists of Justices Yates, Anderson, and Hudson.











[1]  In her
statement of the case, Johns-Adams requests that we Aoverturn@ a Rule
11 Agreement contained in the trial court record.  The agreement apparently was filed on April
19, 2002, and signed by the trial court judge on May 30, 2002.  Johns-Adams has waived this request because
she does not provide any argument or authority to support her request or
explain how this court would have jurisdiction to overturn an agreement entered
by the parties.  See Tex.
R. App. P. 38.1(e), (h); see also Levin v. Harrington, No.
14-99-01094-CV, 2001 WL 422072, at *6 n.7 (Tex. App.CHouston [14th Dist.] April 26,
2001, no pet.) (not designated for publication) (stating that even if appellant
had presented issue for review, he waived review by failing to provide
argument, cite legal authorities, and make relevant record references).  





[2]  Johns-Adams
does not contest the portion of the trial court=s order
directing her to pay child support.





[3]  Former section 156.101 was amended
in 2001.  Act of June 16, 2001, 77th
Leg., R.S., ch. 1289, ' 5, 2001 Tex. Gen. Laws 3108.  Amended section 156.101 took effect on
September 1, 2001, and applies to actions to modify orders in suits affecting
the parent‑child relationship pending on September 1, 2001, or filed
thereafter.  Tex. Gen. Laws at 3111.  Because Williams=s petition to modify was pending on
September 1, 2001, we will address the issues raised in this appeal under
current section 156.101.  The other options under section 156.101 do not apply in
this case.  See Tex. Fam.Code Ann. ' 156.101(2)B(3).  Accordingly, Johns-Adams=s contention that the former
provisions of the Family Code apply to this caseCspecifically
the provision requiring that the trial court find modification would be a
positive improvement for the childC is without merit. 





[4]  Williams
admitted he violated a prior order of the court by living with his fiancée, but
the specific provisions of that order are not in the record before us. 





[5]  Although
Johns-Adams has requested the trial transcript be supplemented with these
orders, they have not yet been received by this court.  These post-judgment orders were issued as a
part of the trial court=s continuing, exclusive jurisdiction over the child
and in connection with issues arising after the trial court had issued its
order to modify the parent-child relationship at issue in this appeal, and
according to Johns-Adams, concerned disputes about the payment of child support
and violations of a temporary injunction. 
Because we have no jurisdiction to consider these rulings, we need not
wait for the supplemental records to render our decision.