NO. 12-04-00244-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
JACQULYN REEVES BELL,                           §                 APPEAL FROM THE 273RD
APPELLANT
 
V.                                                                         §                 JUDICIAL DISTRICT COURT OF

ROBERT JACKSON BELL,
APPELLEE                                                        §                 SHELBY COUNTY, TEXAS
                                                                                                                                                            
MEMORANDUM OPINION
            Appellant Jacqulyn Reeves Bell presents four issues challenging portions of the divorce
decree entered by the trial court following her divorce from Appellee Robert Jackson Bell (“Jack”). 
We reverse and render in part and affirm in part.
 
Background
            The Bells were married on June 28, 1996. Jacqulyn filed for divorce on April 29, 2002, and
Jack countersued for divorce on April 30. Jack sought reimbursement to the community estate for
the value of the enhancement of Jacqulyn’s separate property home because community funds were
expended to improve the home. On October 18, Jacqulyn amended her original petition for divorce,
seeking common-law reimbursement for her time, toil, and effort expended at Center Broadcasting,
Inc., an entity that Jack had acquired shares in prior to and during their marriage. She also sought
reimbursement for one-half of the proceeds remaining from the sale of that business.


 
            On May 23, the trial court heard Jack’s motion for temporary orders. One of the temporary
orders stated that 
 
[Jacqulyn] is specifically authorized to enter into any sale agreement in regard to the home which she
claims as separate property. [Jacqulyn] is also specifically authorized to sell any personal property
deemed to be her separate property, with the exclusion of those items heretofore provided to
[Jacqulyn’s] counsel a copy of which is attached hereto as Exhibit A.


“Exhibit A” included a listing of 1) “Jack’s personal items not yet received from the home place,”
2) “[i]tems that were purchased after their marriage which Jack did not get possession of nor did he
get one-half the value,” and 3) “[i]tems purchased for Jacqulyn by Jack after marriage.”
            The case proceeded to trial on May 29, 2003. Jacqulyn testified that during their marriage
the Bells lived in Jacqulyn’s home, which she acquired from a previous marriage. Jacqulyn was not
living in the home at the time of trial and had it listed for sale at a price of $398,500.00, but the
house had not been sold. She stated that she and her previous husband paid cash for the home and
all of the furniture in the home was her separate property. She also testified that she paid all of the
taxes and insurance on the home from her separate funds. She did not make any improvements to
the home during the Bells’ marriage other than painting or “cleaning up.” Some damage had been
done to the septic system and new lines had to be put in. Jacqulyn acknowledged that $14,694.09
was paid out of her and Jack’s joint checking account to repair the septic system and for other
expenses related to her separate property. 
            Jacqulyn stated that when they married, Jack owned 15 percent of Center Broadcasting, Inc.,
a company that owned and operated the KDET radio station in Center, Texas. After they married,
Jack acquired another 34 percent of the company for $10,000.00, which brought Jack’s ownership
of the company up to 49 percent. The other 51 percent was owned by Tommy Foster. At the time
Jack bought the additional 34 percent of the company, Jacqulyn did not know anything about the
financial condition of the company. In 1997, Jacqulyn and Mike Halls, the Bells’ CPA, learned that 
the station had $176,000.00 in outstanding bills and that the current manager of the station was
taking the money for his personal use. 
            After finding the unpaid bills, Jacqulyn called the creditors and asked them to work with the
station on extending the payment times. She stated that she “worked sometimes almost around the
clock” and “spent several months” working on the financial condition of the station. She and Jack
and the other salesmen collected all they could from the entities that owed the station money in order
to get current on the bills. Jacqulyn testified that Jack did not help with getting the financial records
in order because he was primarily involved with selling advertising for the station. 
            Jacqulyn testified that in 1997, she was the assistant manager of the radio station and was
also secretary of Center Broadcasting, Inc. At the end of 1997, the radio station reported a loss of
$91,166.00 and the value of the shareholders’ equity was a negative $15,343.00. When she began
working for the station, she worked for three months remodeling the station “from front to back” and
cleaning the building. She had her grandson help her sweep and clean the building, wash and paint
the walls, and replace ceiling tiles. Jacqulyn also testified that she had a new air conditioning unit,
water system, flooring and carpet installed. She also bought Jack some new office furniture and a
new safe for the business. Jacqulyn stated that she spent $10,000.00 working on the building and
that if an interior decorator had been hired to do what she did for free, those services would have cost
approximately $50,000.00. She also stated that she and Halls were the primary parties involved in
the negotiations for the sale and that Jack was not involved in the process. According to Jacqulyn,
Jack received more than double the amount that he was originally offered as a result of the efforts
she made during the negotiations. 
            In the spring of 2002, Jack underwent surgery to repair blocked arteries in his legs. Jacqulyn 
testified that on April 17, Jack had signed an authorization to divide the $121,546.03 from the sale
of the stock in the radio station between the two of them. Jacqulyn stated that they had an agreement
that she would receive $60,000.00 of that amount. She also stated that she thought the division of
the $121,546.03 was settled prior to the divorce proceedings. A document entitled “Letter of
Authorization to Change Registration or Transfer Assets” from Jack’s Edward Jones stock portfolio,
signed by both Jack and Jacqulyn and dated April 17, was entered into evidence. Jacqulyn testified
that when Jack signed the document, he knew that he was authorizing her to take the funds out of
his account. She also stated that Jack had been suffering from dementia for the last five years.
            From the tax year 1998 to 2000, Jacqulyn was paid approximately $36,349.72 for her services
at the radio station. From 1997 to 2001, Jack was paid $99,112.00. In 2001, Jack sold his shares
in the corporation for $235,000.00, and a check in the amount of $222,775.03 was placed in their
joint Edward Jones account. Jacqulyn had no personal knowledge as to how that money was spent. 
She later admitted that $100,000.00 of that money was spent on debts that had to be paid off, namely
$30,000.00 in credit card debt, taxes, and other bills. Jacqulyn also admitted that a radio station
receives its revenue from advertising sales and that Jack worked hard making sales and collecting
from the customers. 
            Michael Halls, a certified public accountant, testified that Jacqulyn asked him to look at
Center Broadcasting’s financial records in the fall of 1997. He stated that the business aspects of
the corporation had been neglected and multiple letters from various creditors, including the IRS,
had not been opened and were merely stacked on a desk. According to Halls, Jacqulyn was “very
involved” in trying to estimate where the company was from a financial standpoint and was at the
radio station every day that he was there, for a period of one month to six weeks. Halls said that Jack
was out selling advertising while he and Jacqulyn investigated the business affairs of the radio
station and was not involved in determining the financial condition of the station. 
            In April of 1998, Halls determined that the radio station was $168,000.00 in debt and that
any money being collected was not deposited in the bank. Halls found that the station was not
depositing any funds because the manager “probably had been taking some money that he should
not have.” The bills that the radio station owed were over 30 to 60 days past due, creditors were
threatening lawsuits, and “ABC was fixing to just close them down.” The salespeople had also not
been paid their commissions for more than 18 months at the time Halls began looking at the radio
station’s financial records. Halls would not disagree with the assertion that Jacqulyn helped salvage
the station and helped keep it a going concern. He also agreed that Jacqulyn, by bringing him in to
determine the financial condition of the radio station, in fact did salvage the station in order to keep
it running financially. 
            At the time he began looking at the financial condition of the company, Halls determined that
the value of the stockholders’ equity in Center Broadcasting, Inc. was a negative $15,343.00. Jack’s
business partner then sold his 51 percent of the company to Dudley Waller, who was able to secure
a loan to pay off the $168,000.00 in debt and restructure the company’s financial liabilities. 
            Halls testified that Jacqulyn’s efforts in reviving the business and in the later negotiations for
the sale of the business “significantly increased” the value of the shares of Jack’s stock. Specifically,
Halls stated that Jack was able to receive $48,946.00 more as a result of Jacqulyn’s efforts during
the negotiations and that the business had increased in value by $143,200.00 during the time she
worked at the radio station. 
            On cross examination, Halls stated that a radio station generates its capital through
advertising sales and that Jack was in charge of the sales for KDET. He also agreed that the radio
station’s creditors agreed to extend the station’s credit because they all knew Jack was capable of
running a radio station. Halls did not believe that Jacqulyn owned any “proprietary interest” in
Jack’s 49 percent of the stock; he only stated that she “put a lot of time and effort into it.” Halls also
testified that Jacqulyn paid over $20,000.00 of her own money toward remodeling and other bills
in order “to keep the doors [of the station] open.” He did not know if those monies were repaid to
Jacqulyn. 
            Scott Massey, a certified public accountant, testified on Jack’s behalf and stated that he
provided accounting and tax services for Center Broadcasting, Inc., Center Cable, and San Augustine
Cable. On July 31, 1996, Center Broadcasting, Inc. adopted a plan of partial liquidation and sold
Center Cable and San Augustine Cable. At this time, Tolbert Foster agreed to sell his 34 percent of
the outstanding shares in Center Broadcasting, Inc. to Jack for $10,000.00. According to Massey,
this stock was Jack’s separate property. 
            Once the station was sold and Jack received the $222,775.03 for his shares in the corporation,
Jacqulyn would transfer money from those funds into her and Jack’s joint checking account. She
acknowledged that from September 25, 2001 to April 23, 2002, $96,994.04 was transferred from the
$222,775.03 to their joint checking account and that she and Jack both wrote checks out of that
account. She also stated that Jack’s $1500.00 monthly social security check went into their joint
account. Another check for $6,000.00 was written out of that account to Jacqulyn and Jack, but
Jacqulyn could not remember what they did with that money. 
            Jack stated that prior to Jacqulyn’s filing for divorce, he did not know about any discord or
conflicts of personality. He did not know anything about her filing for divorce until he read about
it in the newspaper. Jack stated that the credit card debt he had was a result of work-related activities
and that the radio station would reimburse him for those charges. He acknowledged that the
$61,000.00 he received from the Edward Jones account was all he had left. He also acknowledged
that he and Jacqulyn worked “hand-in-hand” to bring the radio station back from the brink of
disaster. 
            During their marriage, Jack and Jacqulyn went on cruises and traveled extensively. Jack
stated that Jacqulyn was “primarily a Mercedes fan” because she liked only Mercedes-Benz vehicles. 
According to Jack, Jacqulyn gave him a Rolex watch and a “nice bracelet” and he had guns in her
home. The last time he was at Jacqulyn’s home was on April 26. On April 30, Jacqulyn wrote Jack
and his family a note, stating “I must get on with my work. Please do not disturbe [sic] me, or come
to my home at any time, unless you are invited.” He never went back to Jacqulyn’s home to get his
belongings because Jacqulyn had everything he owned “packed in a minivan” and sent to Hancock’s
home. 
            At the conclusion of the trial, the trial court made its ruling in open court and signed a final
decree of divorce on April 30, 2004. The trial court found that $15,000.00 in community resources
was used to maintain the residence that was Jacqulyn’s separate property and ordered that Jack
recover $7,500.00 of that $15,000.00 out of the proceeds of the sale of the home. The trial court also
ruled that the documents Jack executed that gave Jacqulyn one-half of the $121,546.03 “were not
effective” and that all of Jack’s shares in Center Broadcasting, Inc. were his separate property. The
decree also stated as follows: 
 
The Court further finds that the time, talent, and services of the parties enhanced the value of [Jack’s]
shares of Center Broadcasting, Inc., and that a fair and reasonable value of that enhancement is
$40,000.00. The Court finds that the ratio of community contribution toward enhancement of value
of that stock should be applied toward the funds remaining from the sale of the stock, resulting in the
parties being entitled to a reimbursement of $11,000.00 to [Jacqulyn] and $11,000.00 to [Jack] out
of the funds remaining. [Jacqulyn] is ordered to pay to [Jack] the amount of the funds she took from
said [sic] as a result of the legal representation in this case. 


            Neither party made a request for findings of fact and conclusions of law. Jacqulyn now
appeals the trial court’s division of property, raising four issues for review. 
 
Review of Reimbursement AwardsIn her first and second issues, Jacqulyn contends that the trial court erred by awarding Jack
$7,500.00 for reimbursement of community funds spent to maintain her separate property. 
Specifically, she argues 1) that there is no evidence to support such an award and 2) the trial court
failed to give any consideration to the benefit to the community estate from the Bells’ living in her
separate property home for free. Jack argues that the trial court “apparently determined” that
contributions from the community estate enhanced the value of Jacqulyn’s home. In her fourth issue,
Jacqulyn maintains that the trial court’s award of $40,000.00 to the community estate for the couple’s
time, toil, and effort while working at the radio station was against the great weight and
preponderance of the evidence. Jack argues that the trial court’s award was just and right. Because
these three issues pertain to the division of the marital estate, we will address them together.
Standard of Review
            A trial court is charged with dividing the community estate in a "just and right" manner,
considering the rights of both parties. Tex. Fam. Code Ann. § 7.001 (Vernon Supp. 2004-2005). The
party complaining of the trial court's division of property must demonstrate from evidence in the
record that the division was so unjust that the trial court abused its discretion. Pletcher v. Goetz, 9
S.W.3d 442, 446 (Tex. App.–Fort Worth 1999, pet. denied). Under an abuse of discretion standard,
legal and factual sufficiency are relevant factors in assessing whether the trial court abused its
discretion. Beaumont Bank v. Buller, 806 S.W.2d 223, 226 (Tex. 1991). They are not independent
grounds of error. Ditraglia v. Romano, 33 S.W.3d 886, 889 (Tex. App.–Austin 2000, no pet.);
Crawford v. Hope, 898 S.W.2d 937, 940 (Tex. App.–Amarillo 1995, writ denied). If there is any
reasonable basis for doing so, we must presume that the trial court exercised its discretion properly.
Pletcher, 9 S.W.3d at 446. We will not disturb the trial court's division unless the record
demonstrates "that the division was clearly the result of an abuse of discretion." Id. That is, we will
not reverse the case unless the record clearly shows that the trial court was acting arbitrarily or
unreasonably. See Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985).
            This appeal proceeds without the benefit of findings of fact and conclusions of law. Therefore,
we presume that the trial court made all necessary findings to support its judgment and will affirm
based upon any legal theory finding support in the evidence. Wilkerson v. Wilkerson, 992 S.W.2d
719, 722 (Tex. App.–Austin 1999, no pet.). In determining a "no-evidence" issue, we are to consider
only the evidence and inferences that tend to support the finding and disregard all evidence and
inferences to the contrary. Bradford v. Vento, 48 S.W.3d 749, 754 (Tex. 2001). Anything more than
a scintilla of evidence is legally sufficient to support the finding. Leitch v. Hornsby, 935 S.W.2d 114,
118 (Tex. 1996).
            An assertion that the evidence is "factually insufficient" means that the evidence supporting
the finding is so weak or the evidence to the contrary is so overwhelming that the finding should be
set aside and a new trial ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). We are
required to consider all of the evidence in the case in making this determination. Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998).
Applicable Law 
            The measure of reimbursement when one marital estate expends funds or assets to make
capital improvements to the property of another marital estate is the enhancement in value to the
receiving estate. Anderson v. Gilliland, 684 S.W.2d 673, 675 (Tex. 1985); Cook v. Cook, 693
S.W.2d 785, 786 (Tex. App.–Fort Worth 1985, no writ). This enhancement is the difference between
the fair market value before any improvements and the fair market value after the improvements made
during the marriage. Vickery v. Vickery, 999 S.W.2d 342, 371 (Tex. 1999); Anderson, 684 S.W.2d
at 675. It is not the actual cost. Vickery, 999 S.W.2d at 371; Anderson, 684 S.W.2d at 675. The
party claiming reimbursement bears the burden of establishing the net benefit to the payee estate. 
Vallone v. Vallone, 644 S.W.2d 455, 459 (Tex. 1982); Zieba v. Martin, 928 S.W.2d 788, 789 (Tex.
App.–Houston [14th Dist.] 1996, no writ).
            Additionally, the community estate has a reimbursement claim for the value of the time, toil,
and effort expended to enhance the separate estate, other than that reasonably necessary to manage
and preserve the separate estate, for which the community did not receive adequate compensation.
Jensen v. Jensen, 665 S.W.2d 107, 110 (Tex. 1984); Vallone, 644 S.W.2d at 459; Lifshutz v.
Lifshutz, 61 S.W.3d 511, 519 (Tex. App.–San Antonio 2001, pet. denied). Because of the equitable
nature of the claim, the court must look at all the facts and circumstances to determine what is just
and fair. Penick v. Penick, 783 S.W.2d 194, 197 (Tex. 1988). Great latitude is accorded the trial
court in applying equitable principles to value a reimbursement claim. Id. Such a claim is not merely
a balancing of the ledgers between the marital estates. Rather, the discretion to be exercised in
evaluating a reimbursement claim is equally as broad as the discretion subsequently exercised by the
trial court in making a just and right division of the community estate. Id. at 198. The burden of
proving the claim rests with the claimant. Vallone, 644 S.W.2d at 459. The burden of securing a
finding also rests with the claimant. Id.
Analysis - Reimbursement for Home Expenditures
            The evidence adduced at trial demonstrates that $14,694.09 was used from the Bells’ joint
account to pay for the maintenance of the septic system at Jacqulyn’s home. No evidence was offered
to show that this repair was a capital improvement to the septic system or the home. Even if we
assume that the repair was a capital improvement, the appropriate measure of reimbursement would
be the enhancement in value of Jacqulyn’s home as a result of those expenditures. The only evidence
in the record regarding the value of Jacqulyn’s home was Jacqulyn’s testimony that she was asking
$398,500.00 as a sales price for the home. There was no evidence about the fair market value of the
home before the $14,694.09 was spent. Jack did not meet his burden of proving the enhanced value
of the property. Accordingly, we hold that the trial court abused its discretion in awarding the
community reimbursement of $15,000.00 for the improvements made to Jacqulyn’s home. 
See Zeptner v. Zeptner, 111 S.W.3d 727, 737 (Tex. App.–Fort Worth 2003, no pet.) (holding that trial
court abused its discretion by awarding community reimbursement for improvements to property
when no evidence was offered to prove the value of the property before improvements). Jacqulyn’s
first and second issues are sustained.
Analysis - Reimbursement for Jacqulyn’s Time, Toil and Efforts
            Jacqulyn does not dispute that Jack’s shares in the radio station were his separate property. 
She does argue, however, that she should be entitled to more than $11,000.00 out of the $40,000.00
awarded as reimbursement to the community because of her efforts at the radio station. 
            The evidence showed that during the time they worked at the radio station, Jacqulyn received
$36,349.72 for her services and Jack was paid $99,112.00. Together, the community estate made
$135,461.72 while working at the radio station. The record further demonstrates that the Bells spent
approximately $101,229.00 of the funds Jack received from the sale of the radio station and that
$121,546.03 remained at the time Jacqulyn filed for divorce. The trial court found that $40,000.00 of
the $235,000.00 Jack received for the sale of his shares was a reasonable value for the time, toil, and
effort of the community and that each party was entitled to $11,000.00 out of the funds remaining. 
            Although the trial court must consider all factors offered in evidence that bear on
reimbursement or offsetting benefits, the weight it gives each factor is a matter of discretion rather than
mechanical calculation. See Penick, 783 S.W.2d at 198. The record shows that the community
received a benefit valued at $236,690.72 ($135,461.72 in salaries plus $101,229.00 spent from Jack’s
funds acquired from the sale of the stock) from Jack’s separate property. Jacqulyn does not point us
to, nor can we find, any evidence to show how the $40,000.00 reimbursement award to the community
was not adequate compensation when it has already received $236,690.72 in value for the time, toil,
and effort expended to enhance Jack’s separate property. The trial court did not abuse its discretion
by awarding the $40,000.00 reimbursement award to the community. Jacqulyn’s fourth issue is
overruled. 
 
Enforcement of Rule 11 Agreement
            In her third issue, Jacqulyn argues that the trial court erred by not enforcing “Exhibit A” as a
Rule 11 agreement between the parties. Jack contends that “Exhibit A” was not a Rule 11 agreement
and that the trial court did not err by not enforcing it. 
            An agreement made in open court and entered of record is enforceable. Tex. R. Civ. P. 11. 
A Rule 11 agreement may be enforced as a binding contract notwithstanding the withdrawal of consent
by one of the parties to the agreement prior to judgment. Padilla v. LaFrance, 907 S.W.2d 454, 461-62 (Tex. 1995). 
            Assuming without deciding that “Exhibit A” is a Rule 11 agreement, Jacqulyn does not point
us to any evidence in the record as to how Jack breached the agreement. “Exhibit A” only applied to
Jacqulyn and addressed the property she could not sell at auction. It did not contractually bind Jack
to any obligations. Jacqulyn’s third issue is overruled. 
 
Conclusion
            The trial court erred by awarding Jack $7,500.00 for expenditures used to maintain Jacqulyn’s
separate property because no evidence was introduced to show the enhancement in value as a result
of those expenditures. Jacqulyn has not shown that the trial court abused its discretion in any other
way in its division of the remaining marital estate. Accordingly, we reverse the portion of the trial
court’s award to Jack of $7,500.00 and render judgment that he take nothing on his reimbursement
claim for those community expenditures. The remainder of the divorce decree is affirmed.
 
 
                                                                                                    DIANE DEVASTO 
                                                                                                                 Justice
 
 
 
Opinion delivered June 30, 2005.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
(PUBLISH)