In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-05-189 CV


____________________



HENRY A. CANFIELD, Appellant



V.



COUNTRYWIDE HOME LOANS, INC., Appellee






On Appeal from the County Court at Law No. 2


Montgomery County, Texas


Trial Cause No. 04-01-00613






OPINION


 Henry A. Canfield ("Canfield") appeals from the granting of a summary judgment in
favor of appellee, Countrywide Home Loans, Inc. ("Countrywide"). Canfield sued
Countrywide alleging breach of contract, negligence, interference with an existing
contractual relationship, violation of the Deceptive Trade Practices Act, and fraud in a real
estate transaction. Countrywide filed both traditional and "no evidence" motions for
summary judgment. The pertinent portion of the trial court's summary judgment order
simply reads: "On this day, came on to be heard Countrywide Home Loans, Inc.'s Motion
for Summary Judgment. For the reasons stated in Countrywide Home Loans, Inc.'s Motion
for Summary Judgment, this Court grants a Summary Judgment against Plaintiff. Plaintiff
has also produced no evidence to the contrary." 

 The pertinent background facts are not in dispute. What is in dispute is Canfield's
legal status vis-a-vis these facts. The record indicates that on or around September 18, 1997,
Brian and Barbara Boyd executed a number of written documents in the course of purchasing
a home located at 16915 Ballycastle, Houston, Texas ("Ballycastle Property"). These
documents, all relating to the purchase of the property, are 1) a promissory note, 2) a deed
of trust, 3) an escrow account "disclosure and authorization," 4) a "loan agreement rider,"
and 5) a "notice to homeowner" regarding assumption of HUD/FHA-insured mortgages. 
Except for the "notice to homeowner," each document designates as "borrower" both Brian
and Barbara, with Barbara's signature appearing on all documents and Brian's signature on
the first three listed above. Canfield does not contest the fact that these five documents were
executed by the Boyds contemporaneously with their purchase of the Ballycastle Property. 
The initial "lender" for this transaction was North American Mortgage Company ["North
American"]. At a certain point, Countrywide became the servicer of the Boyds' loan and
continued in that capacity during all times material to this litigation. 

 Prior to initiating this litigation, Canfield had been the owner of a forty-year business,
"Foreclosure Listing Service." Canfield explained that his business provided to subscribers
a monthly record of properties scheduled for foreclosure. Canfield also attended foreclosure
sales and reported information from these proceedings to subscribers. Canfield characterized
himself as an expert in foreclosure proceedings insofar as said proceedings related to
recording and sale activity. Over the course of his forty years in the business, Canfield had
personally purchased property at foreclosure sales on two or three occasions. Also prior to
this litigation, Canfield had sold his business to his daughter and son-in-law, who had
incorporated it with the name "Foreclosure Information Listing Service." 

 Sometime between September 18, 1997, and March 13, 2002, Brian Boyd died. The
parties appear to agree that following Brian's death, Barbara defaulted on the payments on
the Ballycastle Property. On March 13, 2002, Barbara executed a general warranty deed
conveying the Ballycastle Property to Canfield's granddaughter and grandson-in-law,
Amanda and Joseph LeCureux, for the sum of $1,500. On that same day, Barbara also
signed two pre-printed, "form" letters directed to North American. The first reads, in
pertinent part:

 To Whom It May Concern:

 

 At the time my loan is paid off, please apply any remaining balance in
my escrow account to reduce the loan amount and so reflect on your payoff
letter.

 

 Thank you for your cooperation, . . .


 /s/ Barbara L. Boyd 


The second letter to North American is titled "Mortgage authorization to release info letter." 
In part, it contains the following language:

 To Whom It May Concern:


 I/We will be absent for an extended period of time and wish you to send any
and all further payment coupons or correspondence to:


JOE LECUREUX


P O BOX 130515


THE WOODLANDS, TEXAS 77393-0515


Phone 281-[___-____]



 I/We do give them full permission to retrieve any and all information
regarding the property located at:


16915 BALLYCASTLE DR


HOUSTON, TEXAS 77070


 ____________________________________________________


 Including but not limited to mortgages, liens, taxes, insurance, etc, and he also
has my/our full permission to make any changes of any document(s) pertaining
to said property without further notice.


 Also I/We would like any and all escrowed balances to be paid to:


JOE LECUREUX



 Thank you in advance.


 /s/ Barbara L. Boyd 


 The escrow account in question is mentioned explicitly in two of the documents
executed by the Boyds for the purchase of the Ballycastle Property. In the deed of trust, the
section titled "Uniform Covenants" describes, inter alia, the collection of "Escrow Items,"
and the disbursement of said items to the lender as "Escrow Funds." The process of
refunding any escrow amounts, as agreed to by the Boyds, is contained in the following
provision in the deed of trust: 

 The Escrow Funds are pledged as additional security for all sums
secured by this Security Instrument. If Borrower [Boyds] tenders to Lender
[North American/Countrywide] the full payment of all such sums, Borrower's
account shall be credited with the balance remaining for all installment items
(a), (b), and (c) and any mortgage insurance premium installment that Lender
has not become obligated to pay to the Secretary, and Lender shall promptly
refund any excess funds to Borrower. Immediately prior to a foreclosure sale
of the Property or its acquisition by Lender, Borrower's account shall be
credited with any balance remaining for all installments for items (a), (b), and
(c). 


 The second document is designated "Impound/Escrow Account Disclosure and
Authorization." This document explained the escrow account in greater detail to the Boyds,
and included the notation that since the Boyds' loan was FHA insured, the escrow account
would be maintained for the life of the loan to pay "real estate property taxes, hazard
insurance, mortgage insurance, assessments, and/or other items relating to the Property." 
This document also informed the Boyds that the escrow account was "analyzed" annually
to ensure it was sufficiently funded and if the balance is "more than required, the difference
or overage is refunded." Just above the signature lines appears the following language:
"THIS IMPOUND ACCOUNT DISCLOSURE AND AUTHORIZATION IN NO WAY
ALTERS OR AMENDS ANY OF THE PROVISIONS OF THE NOTE AND
MORTGAGE/DEED OF TRUST APPLICABLE TO THIS LOAN." 

 We observe without deciding that the March 13, 2002, conveyance of the Ballycastle
Property by Barbara to the LeCureuxes appears to contravene certain provisions of the
Boyds' FHA-insured loan. Contained within the "notice to homeowner" document executed
along with the promissory note and deed of trust is the following information and
admonishments: 

 You are legally obligated to make the monthly payments required by
your mortgage (deed of trust) and promissory note.

 The Department of Housing and Urban Development (HUD) has acted
to keep investors and non-creditworthy purchasers from acquiring one-to-four
family residential properties covered by certain FHA-insured mortgages. . . .

 HUD will therefore direct the lender to accelerate this FHA-insured
mortgage loan if all or part of the property is sold or transferred to a purchaser
or recipient (1) who will not occupy the property as his or her principal
residence, or (2) who does occupy the property but whose credit has not been
approved in accordance with HUD requirements. . . . 

 When a loan is accelerated, the entire balance is declared "immediately
due and payable." Since HUD will not approve the sale of the property
covered by this mortgage to an investor or to a person whose credit has not
been approved, you, the original homeowner, would remain liable for the
mortgage debt even though the title to the property might have been
transferred to the new buyer.

 Even if you sell your home by letting an approved purchaser (that is, a
creditworthy owner occupant) assume your mortgage, you are still liable for
the mortgage debt unless you obtain a release from liability from your
mortgage lender. FHA-approved lenders have been instructed by HUD to
prepare such a release when an original homeowner sells his or her property
to a creditworthy purchaser who executes an agreement to assume and pay the
mortgage debt and thereby agrees to become the substitute mortgagor. . . . 
You should ask for [the release] if the mortgage lender does not provide it to
you automatically when you sell your home to a creditworthy owner-occupant
purchaser who executes an agreement to assume personal liability for the debt. 
When this form is executed, you are no longer liable for the mortgage debt.
(emphasis in original) 


 The record indicates that following Barbara Boyd's conveyance of the Ballycastle
Property to the LeCureuxes, the LeCureuxes ultimately conveyed the property to Canfield,
who was in "partnership" with the LeCureuxes during the entirety of their dealings with
Barbara Boyd, and who had been providing the financial means to the LeCureuxes for the
purchase of the Ballycastle Property. Canfield explained the arrangement he had with the
LeCureuxes was that he would pay the money required to purchase the Ballycastle Property,
renovate the property, and when the property was sold, Canfield would be fully reimbursed
for whatever he had already spent plus fifty percent of any remainder. Canfield's deposition
testimony clearly indicated the Ballycastle Property was purchased purely for investment
purposes as neither the LeCureuxes nor Canfield ever used the property as their residence. 
According to Canfield, the entire basis for his suit against Countrywide stemmed from the
fact that when Canfield paid the Boyds' loan in full, Countrywide did not pay to Canfield
approximately $3,300 that was being held in an escrow account. 

 We review the trial court's grant of summary judgment de novo. Joe v. Two Thirty
Nine Joint Venture, 145 S.W.3d 150, 156 (Tex. 2004). To prevail on a motion for summary
judgment under Tex. R. Civ. P. 166a(c), the movant must conclusively negate at least one
essential element of the nonmovant's cause of action or conclusively prove each element of
its affirmative defense, thereby showing that it is entitled to judgment as a matter of law and
that no genuine issues of material fact remain. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217,
222-23 (Tex. 1999). 

 When advancing a no-evidence motion for summary judgment, the movant asserts that
there is no evidence of one or more essential elements of a claim or defense that the
nonmovant would have the burden to prove at trial. Tex. R. Civ. P. 166a(i). Unless the
nonmovant produces summary judgment evidence raising a genuine issue of material fact on
the challenged elements, the court must grant the motion. Tex. R. Civ. P. 166a(i); Western
Invs., Inc. v. Urena, 162 S.W.3d 547, 550 (Tex. 2005). "In reviewing a no-evidence claim,
we view the evidence in a light that tends to support the finding of the disputed fact and
disregard all evidence and inferences to the contrary." Minyard Food Stores, Inc. v.
Goodman, 80 S.W.3d 573, 577 (Tex. 2002) (citing Bradford v. Vento, 48 S.W.3d 749, 754
(Tex. 2001)). "A genuine issue of material fact exists if more than a scintilla of evidence
establishing the existence of the challenged element is produced." Ford Motor Co. v.
Ridgway, 135 S.W.3d 598, 600 (Tex. 2004). "[M]ore than a scintilla of evidence exists if the
evidence 'rises to a level that would enable reasonable and fair-minded people to differ in
their conclusions.'" Id. at 601 (quoting Merrell Dow Pham., Inc. v. Havner, 953 S.W.2d
706, 711 (Tex. 1997)). Conversely, "'[w]hen the evidence offered to prove a vital fact is so
weak as to do no more than create a mere surmise or suspicion of its existence, the evidence
is no more than a scintilla and, in legal effect, is no evidence.'" Id. (quoting Kindred v.
Con/Chem., Inc., 650 S.W.2d 61, 63 (Tex. 1983)).

 In the instant case, it appears that the trial court granted summary judgment under both
Rule 166a(c) and Rule 166(a)(i), but provides no specific basis for the ruling. When a trial
court does not supply specific grounds for granting summary judgment, a reviewing court
must affirm the summary judgment if any of the theories presented to the trial court and
preserved for appellate review are meritorious. Provident Life & Acc. Ins. Co. v. Knott, 128
S.W.3d 211, 216 (Tex. 2003). 

 During his deposition, Canfield testified that he bought the Ballycastle Property as "an
entity." When asked to explain what he meant by "entity," Canfield replied, "[t]he land, the
building and the loan[,]" which he further clarified by stating that while he did not actually
buy the loan, he "bought the right to repay the loan from her [Barbara Boyd]." In apparent
contrast to this position, Canfield also repeatedly insisted that he did not assume the Boyds'
loan from Countrywide, and that Barbara Boyd retained the obligation to repay the loan even
after conveying the property to the LeCureuxes. He further insisted that in eventually
acquiring full legal title to the Ballycastle Property, he was a "successor and assign" to the
Boyds and was, therefore, entitled to any excess funds being held by Countrywide in the
escrow account as provided for in the deed of trust. 

 As we understand Canfield's argument, his legal entitlement to the escrow account
funds derived from paragraph twelve in the deed of trust between the Boyds and North
American, and from the notation in the warranty deed from Barbara Boyd to the LeCureuxes
"all escrows pass to grantee," with "grantee" being the LeCureuxes and then Canfield as
successor in title to the LeCureuxes. The pertinent language of paragraph twelve reads, "The
covenants and agreements of this Security Instrument shall bind and benefit the successors
and assigns of Lender and Borrower, . . ." 

 "The fact that a person might receive an incidental benefit from a contract to which
he is not a party does not give that person a right of action to enforce the contract." MCI
Telecommunications Corp. v. Texas Utils. Elec. Co., 995 S.W.2d 647, 651 (Tex. 1999). "A
third party may recover on a contract made between other parties only if the parties intended
to secure some benefit to that third party, and only if the contracting parties entered into the
contract directly for the third party's benefit." Id. Therefore, the intentions of the
contracting parties are controlling. Id. "A court will not create a third-party beneficiary
contract by implication." Id. "The intention to contract or confer a direct benefit to a third
party must be clearly and fully spelled out or enforcement by the third party must be denied." 
Id. "Consequently, a presumption exists that parties contracted for themselves unless it
'clearly appears' that they intended a third party to benefit from the contract." Id. (quoting
Corpus Christi Bank & Trust v. Smith, 525 S.W.2d 501, 504 (Tex. 1975)). 

 In the instant case, we find nothing in the terms of any of the documents executed by
the Boyds and North American intending to confer a direct benefit on Canfield. When the
deed of trust was executed, the legal and equitable estates in the property were severed. See
Flag-Redfern Oil Co. v. Humble Exploration Co., Inc., 744 S.W.2d 6, 8 (Tex. 1987). The
Boyds retained the legal title and North American, now Countrywide, held the equitable title. 
See id. (citing Taylor v. Brennan, 621 S.W.2d 592, 593 (Tex. 1981)). Because Texas follows
the "lien theory" of mortgages, North American/Countrywide was not the owner of the
property and was not entitled to its possession, rentals, or profits. See id. However, the
Boyds' right of legal ownership was subject to the lien retained by North
American/Countrywide. See Texas Bank & Trust Co. of Dallas v. Custom Leasing, Inc., 402
S.W.2d 926, 929-30 (Tex. Civ. App.--Amarillo 1966, no writ). The legal estate Barbara
Boyd conveyed to the LeCureuxes was always subject to the provisions contained in the
documents executed in furtherance of securing the FHA-insured loan -- documents pertaining
to the equitable estate. Any of the subsequent conveyances of the legal estate did not involve
North American or any of its successors-in-interest, including Countrywide. Furthermore,
because Canfield explicitly and openly refused to formally assume the Boyds' financial
obligation, Countrywide was under no duty to recognize any putative "successor" or "assign"
of the Boyds that was not first determined to be a "creditworthy owner-occupant" in
compliance with the provisions contained in the "notice to homeowner" document. All of
Canfield's appellate authorities fail to discuss or apply this crucial distinction between legal
and equitable estates. Neither do his authorities involve the rather unique facts and
circumstances presented by this record. In short, Canfield's authorities are not probative to
any of the issues raised in his appeal. See Tex. R. App. P. 38.1(h). 

 Under all of the facts and circumstances presented in the record before us, none of the
documents executed between the Boyds and North American were intended to secure any
direct benefit to Canfield, and we will not create one from mere surmise. Countrywide's
contractual obligation, as successor to North American, was to the Boyds, the only other
party legally obligated to repay the FHA-insured loan, as neither the LeCureuxes nor
Canfield ever attempted to qualify to assume the Boyds' financial obligation. As Canfield
candidly admits in his appellate brief, all of his causes of action are predicated upon his being
the proper party to receive the excess funds contained in the escrow account. Upon the law
and the facts before us, we find he is not. Therefore, the trial court did not err in granting
Countrywide's motion for summary judgment. Canfield's appellate issues are overruled, and
the judgment of the trial court is affirmed.

 AFFIRMED.

 _________________________

 CHARLES KREGER

 Justice


Submitted on September 15, 2005

Opinion Delivered March 9, 2006


Before McKeithen, C.J., Kreger and Horton, JJ.