Henry A. CANFIELD, Appellant,

v.

COUNTRYWIDE HOME LOANS, INC., Appellee.

No. 09–05–189–CV.

Court of Appeals of Texas, Beaumont.

Submitted Sept. 15, 2005.

Decided March 9, 2006.

Rehearing Overruled March 30, 2006.

Jeffrey K. Canfield, Conroe, for appellant.

Michael D. Conner, Royce F. Carrigan, III, Eric Lipper, Hirsch & Westheimer, PC, Houston, for appellee.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

CHARLES KREGER, Justice.

Henry A. Canfield ("Canfield") appeals from the granting of a summary judgment in favor of appellee, Countrywide Home Loans, Inc. ("Countrywide"). Canfield sued Countrywide alleging breach of contract, negligence, interference with an existing contractual relationship, violation of the Deceptive Trade Practices Act, and fraud in a real estate transaction. Countrywide filed both traditional and "no evidence" motions for summary judgment. The pertinent portion of the trial court's summary judgment order simply reads: "On this day, came on to be heard Countrywide Home Loans, Inc.'s Motion for Summary Judgment. For the reasons stated in Countrywide Home Loans, Inc.'s Motion for Summary Judgment, this Court grants a Summary Judgment against

Plaintiff. Plaintiff has also produced no evidence to the contrary."

The pertinent background facts are not in dispute. What is in dispute is Canfield's legal status vis-a-vis these facts. The record indicates that on or around September 18, 1997, Brian and Barbara Boyd executed a number of written documents in the course of purchasing a home located at 16915 Ballycastle, Houston, Texas ("Ballycastle Property"). These documents, all relating to the purchase of the property, are 1) a promissory note, 2) a deed of trust, 3) an escrow account "disclosure and authorization," 4) a "loan agreement rider," and 5) a "notice to homeowner" regarding assumption of HUD/FHA-insured mortgages. Except for the "notice to homeowner," each document designates as "borrower" both Brian and Barbara, with Barbara's signature appearing on all documents and Brian's signature on the first three listed above. Canfield does not contest the fact that these five documents were executed by the Boyds contemporaneously with their purchase of the Ballycastle Property. The initial "lender" for this transaction was North American Mortgage Company ["North American"]. At a certain point, Countrywide became the servicer of the Boyds' loan and continued in that capacity during all times material to this litigation.

Prior to initiating this litigation, Canfield had been the owner of a forty-year business, "Foreclosure Listing Service." Canfield explained that his business provided to subscribers a monthly record of properties scheduled for foreclosure. Canfield also attended foreclosure sales and reported information from these proceedings to subscribers. Canfield characterized himself as an expert in foreclosure proceedings insofar as said proceedings related to recording and sale activity. Over the course of his forty years in the business,

Canfield had personally purchased property at foreclosure sales on two or three occasions. Also prior to this litigation, Canfield had sold his business to his daughter and son-in-law, who had incorporated it with the name "Foreclosure Information Listing Service."

Sometime between September 18, 1997, and March 13, 2002, Brian Boyd died. The parties appear to agree that following Brian's death, Barbara defaulted on the payments on the Ballycastle Property. On March 13, 2002, Barbara executed a general warranty deed conveying the Ballycastle Property to Canfield's granddaughter and grandson-in-law, Amanda and Joseph Le-Cureux, for the sum of $1,500. On that same day, Barbara also signed two pre-printed, "form" letters directed to North American. The first reads, in pertinent part:

To Whom It May Concern:

At the time my loan is paid off, please apply any remaining balance in my escrow account to reduce the loan amount and so reflect on your payoff letter.

Thank you for your cooperation, . . .

/s/ *Barbara L. Boyd*

The second letter to North American is titled "Mortgage authorization to release info letter." In part, it contains the following language:

To Whom It May Concern:

I/We will be absent for an extended period of time and wish you to send any and all further payment coupons or correspondence to:

**JOE LECUREUX**

**P  O BOX 130515**

**THE WOODLANDS, TEXS 77393–0515**

Phone 281–[___–___]

I/We do give them full permission to retrieve any and all information regarding the property located at:

16915 BALLYCASTLE DR

HOUSTON, TEXAS 77070

---

Including but not limited to mortgages, liens, taxes, insurance, etc, and he also has my/our full permission to make any changes of any document(s) pertaining to said property without further notice. Also I/We would like any and all escrowed balances to be paid to:

**JOE LECUREUX**

Thank you in advance.

/s/ *Barbara L. Boyd*

The escrow account in question is mentioned explicitly in two of the documents executed by the Boyds for the purchase of the Ballycastle Property. In the deed of trust, the section titled "Uniform Covenants" describes, inter alia, the collection of "Escrow Items," and the disbursement of said items to the lender as "Escrow Funds." The process of refunding any escrow amounts, as agreed to by the Boyds, is contained in the following provision in the deed of trust:

> The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower [Boyds] tenders to Lender [North American/Countrywide] the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items (a), (b), and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installments for items (a), (b), and (c).

The second document is designated "Impound/Escrow Account Disclosure and Authorization." This document explained the escrow account in greater detail to the Boyds, and included the notation that since the Boyds' loan was FHA insured, the escrow account would be maintained for the life of the loan to pay "real estate property taxes, hazard insurance, mortgage insurance, assessments, and/or other items relating to the Property." This document also informed the Boyds that the escrow account was "analyzed" annually to ensure it was sufficiently funded and if the balance is "more than required, the difference or overage is refunded." Just above the signature lines appears the following language: "THIS IMPOUND ACCOUNT DISCLOSURE AND AUTHORIZATION IN NO WAY ALTERS OR AMENDS ANY OF THE PROVISIONS OF THE NOTE AND MORTGAGE/DEED OF TRUST APPLICABLE TO THIS LOAN."

We observe without deciding that the March 13, 2002, conveyance of the Ballycastle Property by Barbara to the LeCureuxes appears to contravene certain provisions of the Boyds' FHA-insured loan. Contained within the "notice to homeowner" document executed along with the promissory note and deed of trust is the following information and admonishments:

> You are legally obligated to make the monthly payments required by your mortgage (deed of trust) and promissory note.

> The Department of Housing and Urban Development (HUD) has acted to keep investors and non-creditworthy purchasers from acquiring one-to-four family residential properties covered by certain FHA-insured mortgages. . . .

> HUD will therefore direct the lender to accelerate this FHA-insured mortgage loan if all or part of the property

is sold or transferred to a purchaser or recipient (1) who will not occupy the property as his or her principal residence, or (2) who does occupy the property but whose credit has not been approved in accordance with HUD requirements....

When a loan is accelerated, the entire balance is declared "immediately due and payable." Since HUD will not approve the sale of the property covered by this mortgage to an investor or to a person whose credit has not been approved, you, the original homeowner, would remain liable for the mortgage debt even though the title to the property might have been transferred to the new buyer.

Even if you sell your home by letting an approved purchaser (that is, a creditworthy owner occupant) assume your mortgage, you are still liable for the mortgage debt unless you obtain a *release from liability* from your mortgage lender. FHA-approved lenders have been instructed by HUD to prepare such a release when an original homeowner sells his or her property to a creditworthy purchaser who executes an agreement to assume and pay the mortgage debt and thereby agrees to become the *substitute mortgagor* .... You should ask for [the release] if the mortgage lender does not provide it to you automatically when you sell your home to a creditworthy owner-occupant purchase who executes an agreement to assume personal liability for the debt. When this form is executed, you are no longer liable for the mortgage debt. (emphasis in original)

The record indicates that following Barbara Boyd's conveyance of the Ballycastle Property to the LeCureuxes, the LeCureuxes ultimately conveyed the property to Canfield, who was in "partnership" with the LeCureuxes during the entirety of their dealings with Barbara Boyd, and who had been providing the financial means to the LeCureuxes for the purchase of the Ballycastle Property. Canfield explained the arrangement he had with the LeCureuxes was that he would pay the money required to purchase the Ballycastle Property, renovate the property, and when the property was sold, Canfield would be fully reimbursed for whatever he had already spent plus fifty percent of any remainder. Canfield's deposition testimony clearly indicated the Ballycastle Property was purchased purely for investment purposes as neither the LeCureuxes nor Canfield ever used the property as their residence. According to Canfield, the entire basis for his suit against Countrywide stemmed from the fact that when Canfield paid the Boyds' loan in full, Countrywide did not pay to Canfield approximately $3,300 that was being held in an escrow account.

We review the trial court's grant of summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 156 (Tex.2004). To prevail on a motion for summary judgment under Tex.R. Civ. P. 166a(c), the movant must conclusively negate at least one essential element of the nonmovant's cause of action or conclusively prove each element of its affirmative defense, thereby showing that it is entitled to judgment as a matter of law and that no genuine issues of material fact remain. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 222–23 (Tex.1999).

When advancing a no-evidence motion for summary judgment, the movant asserts that there is no evidence of one or more essential elements of a claim or defense that the nonmovant would have the burden to prove at trial. Tex.R. Civ. P. 166a(i). Unless the nonmovant produces summary judgment evidence raising a genuine issue of material fact on the chal-

lenged elements, the court must grant the motion. Tex.R. Civ. P. 166a(i); *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex.2005). "In reviewing a no-evidence claim, we view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary." *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex.2002) (citing *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001)). "A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex.2004). "[M]ore than a scintilla of evidence exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* at 601 (quoting *Merrell Dow Pham., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)). Conversely, "'[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Id.* (quoting *Kindred v. Con/Chem., Inc.*, 650 S.W.2d 61, 63 (Tex.1983)).

In the instant case, it appears that the trial court granted summary judgment under both Rule 166a(c) and Rule 166(a)(i), but provides no specific basis for the ruling. When a trial court does not supply specific grounds for granting summary judgment, a reviewing court must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex.2003).

During his deposition, Canfield testified that he bought the Ballycastle Property as "an entity." When asked to explain what he meant by "entity," Canfield replied, "[t]he land, the building and the loan[,]" which he further clarified by stating that while he did not actually buy the loan, he "bought the right to repay the loan from her [Barbara Boyd]." In apparent contrast to this position, Canfield also repeatedly insisted that he did not assume the Boyds' loan from Countrywide, and that Barbara Boyd retained the obligation to repay the loan even after conveying the property to the LeCureuxes. He further insisted that in eventually acquiring full legal title to the Ballycastle Property, he was a "successor and assign" to the Boyds and was, therefore, entitled to any excess funds being held by Countrywide in the escrow account as provided for in the deed of trust.

As we understand Canfield's argument, his legal entitlement to the escrow account funds derived from paragraph twelve in the deed of trust between the Boyds and North American, and from the notation in the warranty deed from Barbara Boyd to the LeCureuxes "all escrows pass to grantee," with "grantee" being the LeCureuxes and then Canfield as successor in title to the LeCureuxes. The pertinent language of paragraph twelve reads, "The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, ..."

"The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce the contract." *MCI Telecommunications Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex.1999). "A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit." *Id.* Therefore, the intentions of the contracting parties are controlling. *Id.* "A court will not

create a third-party beneficiary contract by implication." *Id.* "The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied." *Id.* "Consequently, a presumption exists that parties contracted for themselves unless it 'clearly appears' that they intended a third party to benefit from the contract." *Id.* (quoting *Corpus Christi Bank & Trust v. Smith,* 525 S.W.2d 501, 504 (Tex.1975)).

In the instant case, we find nothing in the terms of any of the documents executed by the Boyds and North American intending to confer a direct benefit on Canfield. When the deed of trust was executed, the legal and equitable estates in the property were severed. *See Flag–Redfern Oil Co. v. Humble Exploration Co., Inc.,* 744 S.W.2d 6, 8 (Tex.1987). The Boyds retained the legal title and North American, now Countrywide, held the equitable title. *See id.* (citing *Taylor v. Brennan,* 621 S.W.2d 592, 593 (Tex.1981)). Because Texas follows the "lien theory" of mortgages, North American/Countrywide was not the owner of the property and was not entitled to its possession, rentals, or profits. *See id.* However, the Boyds' right of legal ownership was subject to the lien retained by North American/Countrywide. *See Texas Bank & Trust Co. of Dallas v. Custom Leasing, Inc.,* 402 S.W.2d 926, 929–30 (Tex.Civ.App.-Amarillo 1966, no writ). The legal estate Barbara Boyd conveyed to the LeCureuxes was always subject to the provisions contained in the documents executed in furtherance of securing the FHA-insured loan—documents pertaining to the equitable estate. Any of the subsequent conveyances of the legal estate did not involve North American or any of its successors-in-interest, including Countrywide. Furthermore, because Canfield explicitly and openly re-

fused to formally assume the Boyds' financial obligation, Countrywide was under no duty to recognize any putative "successor" or "assign" of the Boyds that was not first determined to be a "creditworthy owner-occupant" in compliance with the provisions contained in the "notice to homeowner" document. All of Canfield's appellate authorities fail to discuss or apply this crucial distinction between legal and equitable estates. Neither do his authorities involve the rather unique facts and circumstances presented by this record. In short, Canfield's authorities are not probative to any of the issues raised in his appeal. *See* Tex.R.App. P. 38.1(h).

Under all of the facts and circumstances presented in the record before us, none of the documents executed between the Boyds and North American were intended to secure any direct benefit to Canfield, and we will not create one from mere surmise. Countrywide's contractual obligation, as successor to North American, was to the Boyds, the only other party legally obligated to repay the FHA-insured loan, as neither the LeCureuxes nor Canfield ever attempted to qualify to assume the Boyds' financial obligation. As Canfield candidly admits in his appellate brief, all of his causes of action are predicated upon his being the proper party to receive the excess funds contained in the escrow account. Upon the law and the facts before us, we find he is not. Therefore, the trial court did not err in granting Countrywide's motion for summary judgment. Canfield's appellate issues are overruled, and the judgment of the trial court is affirmed.

AFFIRMED.