Bruce BRADFORD, et al., Petitioners,

v.

Roell VENTO, et al., Respondents.

No. 99–0966.

Supreme Court of Texas.

Argued on Oct. 4, 2000.

Decided April 26, 2001.

Rehearing Overruled Aug. 2, 2001.

Roger Townsend, Russell S. Post, Hogan Dubose & Townsend, Houston, Douglas Laycock, William Powers, Jr., University of Texas School of Law, Austin, Rex N. Leach, Daniel G. Gurwitz, McAllen, for Petitioners.

Donald B. Edwards, Craig S. Smith, Smith & Edwards, Corpus Christi, Felipe Garcia, Jr., Catherine W. Smith, Law Offices of Ramon Garcia, Edinburg, for Respondents.

Justice ABBOTT delivered the opinion of the Court.

In this case, Roell and Debra Vento sued the defendants alleging various causes of action—including fraud, tortious interference with prospective contractual relations, intentional infliction of emotional distress, DTPA violations, and civil conspiracy—arising out of their attempted

purchase of a sports memorabilia store. We must decide whether legally sufficient evidence supports the jury's verdict against Bruce Bradford, Simon Property Group, and Golden Ring Mall Company. The trial court rendered judgment on the verdict, holding the defendants jointly and severally liable for $1,274,000 in actual damages and $6,500,000 in exemplary damages. The court of appeals affirmed in part and reversed in part, holding the defendants jointly and severally liable for $864,000 in actual damages and $2,520,000 in exemplary damages. 997 S.W.2d 713. We hold that no evidence supports any of the jury's liability findings, and we affirm in part and reverse in part the court of appeals' judgment and render judgment that the Ventos take nothing from Bradford, Simon, and Golden Ring.

## I. Background

Tom Taylor operated Tom's Sports Cards in the Valle Vista Mall in Harlingen, Texas. He signed successive leases with the mall, each for a two or three month period. These leases required written consent from the mall before they could be assigned. In addition, Taylor paid a percentage of sales revenues to the mall.

Roell Vento, who had been interested in sports cards and sports memorabilia for several years, established a business relationship with Taylor and began selling items on consignment at the store. Sometime in early or mid–1994, Taylor and Vento became partners and the name of the business was changed to Collector's Choice. Taylor continued to negotiate and sign leases with the mall for Collector's Choice; Vento never personally signed a lease with the mall.

Once he became a partner in Collector's Choice, Vento moved much of his collection, along with several display cases, into the store. In August 1994, Taylor went out of town for several weeks and left Vento in charge. According to Vento, he and Taylor had agreed that Taylor would sell the store to Vento when he returned. Before he left, Taylor signed a new lease with the mall for the months of September and October. According to Vento, Taylor sold his share of the business to the Ventos on September 15, 1994 for $7,000, and signed a contract to that effect. But after the alleged sale on September 15, Taylor continued to go to the store and wait on customers, which seemed "odd" to Vento.

On October 4, Vento went to Bradford's office and paid him the October rent with a $770 cashier's check, which the mall required because Taylor had written some bad checks. According to Vento, he told Bradford that he had bought the store and showed Bradford a written contract signed by Taylor that indicated the Ventos' intent to purchase the store. Vento then asked Bradford about a long-term lease. Bradford congratulated Vento and mentioned that he already knew that Vento was purchasing the store. Bradford then consulted his files, told Vento that the store's space "should" rent for $2,700, and that $770 was a "decent deal." He also said that a long-term lease was a bad idea because sports card stores generally do not do well in malls, and said he would "take care of" Vento in January.

That afternoon, Vento questioned Taylor about his continued presence at the store. Taylor denied that he had sold the store to Vento, contending that the $7,000 was merely a reimbursement for losses Vento caused when Taylor was away. They had an altercation in the mall, prompting Vento to call the police. Taylor left before the police arrived, and Vento never told Bradford about the dispute. Either on October 5 or early on October 6, Taylor approached Bradford and informed him that he still owned the store and that there could be

trouble with Vento. Bradford alerted the mall's security guard and directed him to remain near the store.

On October 6, Taylor and Vento had a second confrontation in the mall. Taylor and his wife were waiting outside the store when Vento arrived. The mall's security officer was at the store, and Bradford was nearby. When Vento unlocked the store, he, the Taylors, and Bradford entered, and there was a heated discussion between Vento and Taylor. Either Taylor or Taylor's wife called the police, who soon arrived. The police questioned Bradford, and accounts differ whether they asked him who owned the store or whose name was on the lease. According to Vento, Bradford told the police that Taylor owned the store. The police officers offered different versions of what they asked and what Bradford said. According to one officer, Bradford told him that Taylor owned the store and that he did not want Vento in the mall since he was causing a scene. According to the other officer, Bradford said that Taylor was on the lease, and that he wanted to file criminal trespassing charges against Vento if he returned. Eventually, the police asked Vento to leave because he could not prove his ownership. Taylor later changed the store's name back to Tom's Sports Cards and, on October 17, signed a new lease with the mall for November and December.

On November 8, the Ventos filed suit for damages against Taylor, Bradford, and the mall, and sought a temporary restraining order, a temporary injunction, and an accounting. On November 23, Vento obtained a temporary injunction restoring the business to him, and thereafter resumed operation of the store. Vento testified that the value of the merchandise in the store was $35,000 to $40,000 less than it had been on October 6.

In December, Vento paid the usual monthly rent of $770, but failed to pay either the holiday increase of $1,430, which was required by the lease, or the store's past-due amounts, both of which together totaled over $4,000. When Taylor's lease expired on December 31, Vento remained in the mall but did not obtain a new lease. After posting the appropriate notices, the mall changed the locks on January 19.

Soon after being locked out, Vento made arrangements for another man, Louis Martin, to buy the business for between $6,000 and $9,000. Martin agreed to use part of the purchase price to pay the store's outstanding debts. But Martin wanted to see an inventory of the business before closing the deal. Martin, accompanied by Vento, went to the mall office with a check to pay the past-due amounts and asked to view the store. Vento testified that a mall employee told him that the only way they would be allowed in the store was for Vento to sign a statement releasing the mall from all liability.[1] Vento refused, and he and Martin left. A few days later, Martin returned to the mall, and Bradford permitted him to enter the store and view its contents. After seeing the merchandise, Martin declined to go through with the deal. Soon after, Vento was allowed in the store to recover his property without signing a release.

The Ventos proceeded to trial against Taylor, Bradford, Simon, and Golden Ring on their claims of fraud, intentional infliction of emotional distress, DTPA violations, tortious interference with prospective contractual relations, and civil conspiracy. The jury returned a verdict

---

1. Vento testified that he was told, "You have to release your lawsuit and every claim that you ever had against the mall for this."

favorable to the Ventos on each issue. Bradford, Simon, and Golden Ring filed several post-trial motions contending that the evidence was legally insufficient to support the jury's verdict. The trial court overruled the motions and rendered judgment on the verdict against Bradford, Simon, Golden Ring, and Taylor, jointly and severally, for $1,274,000 in actual damages and $6,500,000 in exemplary damages. Bradford, Simon, and Golden Ring appealed; Taylor did not.

The court of appeals affirmed in part and reversed in part. 997 S.W.2d 713. Specifically, the court of appeals found no evidence of civil conspiracy, but otherwise affirmed the jury's liability findings, and held Bradford, Simon, Golden Ring, and Taylor jointly and severally liable based on the single injury rule. After correcting a mathematical error regarding punitive damages, the court of appeals rendered judgment for the Ventos against Taylor, Bradford, Simon, and Golden Ring, jointly and severally, for $864,000 in actual damages and $2,520,000 in exemplary damages.

Bradford, Simon, and Golden Ring filed a petition for review challenging, among other things, the legal sufficiency of the evidence supporting the jury's verdict on fraud, intentional infliction of emotional distress, tortious interference with prospective contractual relations, and DTPA violations.[2] The Ventos filed a petition for review challenging the court of appeals' judgment as to the civil conspiracy claim. We granted both petitions for review.

## II. Standard of Review

■ In reviewing a "no evidence" point, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Weirich v.*

Weirich, 833 S.W.2d 942, 945 (Tex.1992). Because Bradford, Simon, and Golden Ring did not object to the jury charge, we review the sufficiency of the evidence in light of the charge submitted. *See Wal–Mart Stores, Inc. v. Sturges,* 2001 WL 228139 (Tex.2001); *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 68 (Tex.2000).

## III. Fraud

■ Bradford, Simon, and Golden Ring first contend that the court of appeals erred in upholding the jury's fraud finding. The trial court submitted the following issue to the jury without objection:

### QUESTION NO. 1

Did any of the defendants commit fraud against Roell Vento? Answer Yes or No for each defendant:

. . .

Fraud occurs when—

a. a party makes a material misrepresentation

b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

c. the misrepresentation is made with the intention that it should be acted on by the other party, and

d. the other party acts in reliance on the misrepresentation and thereby suffers injury.

Fraud may also occur when—

a. a party conceals or fails to disclose a material fact within the knowledge of that party,

b. the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,

**2.** Taylor did not file a petition for review.

c. the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and

d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

The Ventos contend that their fraud claim arises out of the conversation between Vento and Bradford on October 4, when Vento paid the October rent due under the existing lease and attempted to secure a new lease for himself. Under the evidence most favorable to the Ventos, during that conversation Bradford made the following statements: (1) he congratulated Vento on the purchase and said he "knew all about it"; (2) he told Vento "not to worry" about a long-term lease until January and to come back in January and he would "take care of" him; and (3) he said that the space should rent for $2700 and the $770 rent under the current lease was a "decent deal."

None of Bradford's statements amounts to an actionable affirmative misrepresentation. Vento himself testified that he understood Bradford's statements to mean only that he would have to "work out" a lease in January. But, under the submitted jury instruction, Bradford could nevertheless be liable if, with the intent to induce Vento into some action, he failed to disclose material facts with the knowledge that Vento was ignorant of those facts and did not have an equal opportunity to discover the truth. The court of appeals held that "Bradford's assurance that he would 'take care of' Vento's long-term lease concerns in January and his failure to disclose pertinent information regarding the procedures for obtaining a new lease constituted a partial disclosure which conveyed a false impression." 997 S.W.2d at 725. The court reasoned that Bradford's "partial disclosure" conveyed the false impression

that any rent increase would not occur until January at the earliest, and that executing a new lease was a mere formality. *Id.* at 725–26. This impression was arguably false because Bradford did not advise Vento that the lease was non-assignable, that additional rent would be due for December, or that Vento would be required to apply for a new lease.

Bradford contends that he did not owe a duty to disclose information to Vento in their arm's-length transaction because there is no evidence that Bradford knew Vento was ignorant of the lease terms or that he did not have an equal opportunity to discover them, as required by the jury charge. As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). Thus, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent. *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex.1995); *Smith v. Nat'l Resort Communities, Inc.*, 585 S.W.2d 655, 658 (Tex.1979). Whether such a duty exists is a question of law. *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633 (Tex.App.—San Antonio 1993, writ denied).

Several courts of appeals have held that a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression. *See, e.g., Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex.App.—Houston [14th Dist.] 1997, no writ); *Ralston Purina*, 850 S.W.2d at 636. The *Restatement (Second) of Torts* section 551 also recognizes a general duty to disclose facts in a commercial setting. RESTATEMENT (SECOND) OF TORTS § 551 (1977). In such cases,

a party does not make an affirmative misrepresentation, but what is said is misleading because other facts are not disclosed. We have never adopted section 551. *SmithKline Beecham*, 903 S.W.2d at 352. But even if we were to adopt such a general duty, there is no evidence to support the jury's liability finding under the submitted jury charge.

The charge required Vento to show that Bradford knew that Vento was ignorant of the facts and did not have an equal opportunity to discover the truth. The court of appeals concluded that "Vento's questions to Bradford about the lease were sufficient to show Vento's ignorance about the lease and Bradford's knowledge that Vento lacked such information." 997 S.W.2d at 725. We conclude that there is no evidence that Bradford knew either that Vento was ignorant of the lease terms or that he did not have an equal opportunity to discover them.

Although Vento purportedly purchased the store, he never asked Bradford or any other mall personnel for a copy of the lease. And during their discussion on October 4, Vento never asked Bradford about any terms of the existing lease or about rent for November or December. He never asked for the existing lease to be assigned to him. In fact, there is no evidence that Vento asked about anything other than obtaining a long-term lease for himself. Accordingly, contrary to the court of appeals' conclusion that "Vento's questions to Bradford about the lease were sufficient to show ... Bradford's knowledge that Vento lacked ... information," *id.*, there is no evidence that Vento's single question regarding the possibility of a long-term lease affirmatively indicated to Bradford that Vento was ignorant of the lease terms.

In addition, there is no evidence that Bradford knew that Vento had not obtained or could not obtain the information from other sources, such as Taylor, from whom Vento was buying the store. Bradford was aware that Vento knew that rent had to be paid by cashier's check, which would have indicated that Vento had obtained at least some information about the lease arrangement from Taylor. Bradford could have reasonably assumed that Vento had obtained a copy of the lease from Taylor, and that he would have inquired about the lease's terms and the store's expenses before contracting to buy the store. This is merely the type of information that a buyer would be expected to discover by ordinary inquiry. *See* RESTATEMENT (SECOND) OF TORTS § 511 cmt. k (1977) ("The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself. . . ."). Although Vento had in fact asked Taylor for a copy of the lease and never received it, there is no evidence that Bradford knew this. Thus, there is no evidence that Bradford knew that Vento lacked information and did not have "an equal opportunity to discover the truth." Accordingly, the Ventos' fraud claim against Bradford fails. For the same reasons, the Ventos' fraud claim against Simon and Golden Ring—which was based on Bradford's allegedly fraudulent acts—also fails.

## IV. Tortious Interference with Prospective Contract

■ Bradford next challenges the jury's verdict that he tortiously interfered with Vento's prospective contractual relations. The Ventos contend that Bradford tortiously interfered with the prospective contract to sell the business to Louis Martin by demanding that Vento release the mall from liability before permitting Vento and Martin to enter the store. The court of appeals held that there was no evidence

that Bradford's demand for a release interfered with Vento's contract with Martin because Martin testified that he would not have bought the store had it been in disarray,[3] and there was no evidence that the store's inventory was intact when Vento and Martin tried to gain access to the store. 997 S.W.2d at 731–32. We agree with the court's analysis and conclusion on that issue.

The Ventos also contend that, by telling police that Taylor owned the store and effectively ousting Vento, Bradford interfered with Vento's prospective contractual relations with the store's customers. The court of appeals held that there was legally and factually sufficient evidence that Bradford interfered with the Ventos' prospective contracts with potential customers. *Id.* at 732. Bradford challenges that conclusion on legal sufficiency grounds.

The jury was instructed that "a party wrongfully interferes with a contract when there was a reasonable probability that Roell Vento would have entered into contractual relationships and any [defendant] intentionally prevented the contractual relationship from occurring with the purpose of harming Roell Vento." Bradford contends that there is no evidence that he intended to interfere with Vento's prospective business relations. Specifically, Bradford argues that there is no evidence that he told police that Taylor owned the store for the purpose of interfering with Vento's prospective sales to potential future customers. In fact, Bradford contends that taking such action would have been contrary to his own interests because the mall received a percentage of the store's sales revenues. Vento responds that there is evidence that Bradford intended to interfere with his potential contractual relations because Bradford was " 'substantially cer-

tain' that his conduct would interfere with Vento's relations." Specifically, Vento argues that "Bradford falsely informed the police that Taylor owned Collector's Choice, asked them to divest Vento of his property, and gave it to Taylor" and that these facts, taken together, constitute legally sufficient evidence that Bradford knew his conduct would interfere with Vento's contractual relations.

Under the *Restatement (Second) of Torts*, interference is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result." RESTATEMENT (SECOND) OF TORTS § 766B cmt. d (1979). But the *Restatement* further provides that "[i]f [the actor] had no desire to effectuate the interference by his action but knew that it would be a mere incidental result of conduct he was engaging in for another purpose, the interference may be found to be not improper." *Id.*

■ The evidence shows that the police, in attempting to quell the disturbance in the mall, asked Bradford either who was on the lease or who owned the store. Under Vento's version of the facts, Bradford replied that Taylor owned the store and threatened to file criminal trespassing charges against Vento if he returned. But this is not evidence that Bradford acted with the intent to harm Vento's business relations. Although Vento contends that Bradford knew Vento owned the store because Bradford congratulated him on October 4, that does not mean that Bradford was lying two days later when he told police Taylor owned the store. Vento showed Bradford the contract for sale, but the contract indicated only that Taylor *wished to sell* his share of the store to

---

**3.** Specifically, Martin testified that, even if he had been allowed to go into the store on the first occasion, he probably would have passed on the deal to buy the store's contents.

Vento, stating that "Roell and Debra Vento have signed below stating their intent to purchase the additional 50% of Collector's Choice from Tom Taylor." Although Bradford indicated that he knew Vento was purchasing the store, there is no evidence that he knew that the sale had been finalized. And, on October 5 or 6, Taylor—with whom Bradford had had previous dealings as owner of the store and whose name was on the lease—told Bradford that he still owned the store despite Vento's claim to ownership. Thus, the evidence shows at most that Bradford knew that there was a dispute over ownership.[4]

Further, the evidence shows that Bradford was responding to police questioning in an attempt to end the disturbance and protect mall property. In order to resolve the situation immediately, the police asked Bradford for a judgment call regarding who owned the store. There is no evidence that Bradford was intending to prevent Vento from dealing with prospective future customers when he told police that Taylor owned the store. When Bradford responded to police questioning, the fact that Vento would not be able to do business with customers was "a mere incidental result of conduct [Bradford] was engaging in for another purpose." *Id.* Thus, the interference was at most only an incidental result of Bradford's legitimate conduct. Accordingly, there is no evidence to support the jury's finding that Bradford tortiously interfered with the Ventos' prospective contractual relations.

## V. Intentional Infliction of Emotional Distress

■ The jury found that Bradford intentionally inflicted emotional distress on the Ventos and awarded them $100,000 in damages. The jury was correctly charged that intentional infliction of emotional distress occurs when: (1) a person acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the person's actions caused another person's emotional distress; and (4) the emotional distress suffered by the other person was severe. *See GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 611 (Tex.1999). The Ventos' intentional infliction of emotional distress claim rests on Bradford's behavior on October 6–the date of the second altercation in the mall. Bradford contends that, as a matter of law, his conduct was not extreme and outrageous.

■ Whether a defendant's conduct is "extreme and outrageous" is a question of law. *Brewerton v. Dalrymple,* 997 S.W.2d 212, 216 (Tex.1999). The mere fact that a defendant's conduct is tortious or otherwise wrongful does not, standing alone, necessarily render it "extreme and outrageous." *See id.* Instead, to be "extreme and outrageous," conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *GTE,* 998 S.W.2d at 611.

As noted, Bradford told police that Taylor owned the store and threatened to file criminal trespassing charges against Vento if he returned. In taking these actions, Bradford was trying to quell the disturbance in the mall—which he was within his legal rights to do. Just like investigating reasonably credible allegations of employee dishonesty, preventing disturbances on mall property is "a managerial function that is necessary to the ordinary operation

---

4. Although Bradford accepted October rent from Vento, this was not an assignment of the lease to Vento because the rent was due under the existing lease with Collector's Choice, which was owned by both Vento and Taylor.

of a business organization." *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995). Business managers must have latitude to exercise their rights in a permissible way in order to properly manage their business, even though it may not always be pleasant for those involved. *Cf. GTE*, 998 S.W.2d at 612 (holding that an employer must be able to exercise its rights in a permissible way even though emotional distress results).

Although Bradford could certainly have given the police more information than he did, his failure to do so was not extreme and outrageous. By responding to the police officer's question, Bradford was merely exercising his rights as mall manager in a permissible way; without more, his behavior does not amount to extreme and outrageous conduct. *See Wornick Co. v. Casas*, 856 S.W.2d 732, 735 (Tex.1993) (holding that an employer's having a terminated employee escorted from the premises by a security guard is not extreme and outrageous as a matter of law).

## VI. DTPA

The DTPA applies to transactions in goods or services, and defines "goods" as "tangible chattels or real property purchased or leased for use." TEX. BUS. & COM.CODE § 17.45(1). The Ventos contend that, by his conduct during the October 4 conversation with Vento regarding a lease, Bradford violated the DTPA by causing confusion or misunderstanding, *see* TEX. BUS. & COM.CODE § 17.46(b)(2),(3), committing misrepresentations, *see id.* § 17.46(b)(5),(8),(12), concealing information, *see id.* § 17.46(b)(23), and engaging in unconscionable conduct, *see id.* § 17.50(a)(3). Bradford contends that there is no evidence to support liability under any of these provisions.

### A. DTPA "laundry list"

Vento submitted instructions under subsections 17.46(b)(2), (3), (5), (8), (12), and (23). Vento offers no evidence, and none appears in the record, to support a finding under subsection (b)(2), which involves "causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services." *Id.* § 17.46(b)(2). Subsection (b)(2) deals with deception in the origin, source, or endorsement of goods and services. *See Potere, Inc. v. Nat'l Realty Serv.*, 667 S.W.2d 252, 257 (Tex.App.—Houston [14 Dist.] 1984, no writ). The record contains no evidence that any action by Bradford caused such confusion. Similarly, there is no evidence to support Bradford's liability under subsection (b)(3), which involves "causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another." TEX. BUS. & COM. CODE § 17.46(b)(3). And the record contains no evidence to support a finding that Bradford violated subsection (b)(8) by "disparaging the goods, services, or business of another by false or misleading representation of facts." *Id.* § 17.46(b)(8).

▮▮▮▮ Subsections (b)(5) and (b)(12) involve a defendant's representations that goods, services, agreements, or persons have characteristics that they do not in fact have. *Id.* § 17.46(b)(5), (12). But the only possible misrepresentation that Bradford made was that he would "take care of" Vento in January. Vento testified that he understood this to mean that he would have to "work out" a lease in January. Bradford's statement is simply too vague to provide a standard for the jury to use to measure the accuracy of the representation; it is therefore nonactionable. *See Douglas v. Delp*, 987 S.W.2d 879, 886 (Tex. 1999).

▮▮▮▮ Last, the jury was asked whether Bradford "fail[ed] to disclose in-

formation concerning goods or services that was known at the time of the transaction, if such failure to disclose such information was intended to induce a person into a transaction which he would not have entered had the information been disclosed." As in the instruction, subsection (b)(23) requires that "information known at the time of the transaction must be withheld *for the purpose of inducing the consumer into a transaction which the consumer would not have entered had the information been disclosed.*" *Doe v. Boys Clubs, Inc.,* 907 S.W.2d 472, 479 (Tex.1995) (emphasis added); *see also* Tex. Bus. & Com.Code § 17.46(b)(23). But there is no evidence that Bradford intended to induce Vento into a transaction by his actions on October 4. Bradford could not have intended to induce Vento into paying October rent because that rent was already due under the existing lease with Collector's Choice. Bradford and Vento did not engage in any other transaction in goods or services at that time.[5] They did not negotiate a lease, and nothing Bradford said or did on October 4 could have been intended to induce Vento to purchase the store because Vento had already purchased the store in September. Because a defendant's deceptive trade act or practice is not actionable under the DTPA unless it was committed in connection with the plaintiff's transaction in goods or services, Vento's claim under subsection (b)(23) is not actionable. *See Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 649–50 (Tex.1996).

### B. DTPA unconscionable action

Section 17.50(a)(3) of the DTPA provides that a consumer may recover actual damages for "any unconscionable action or course of action" that is the producing cause of damages. Tex. Bus. & Com.Code § 17.50(a)(3). The DTPA defines an "unconscionable action or course of action" as "an act or practice, which … takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id.* § 17.45(5). Unconscionability under the DTPA is an objective standard for which scienter is irrelevant. *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 677 (Tex.1998). To prove an unconscionable action or course of action, a plaintiff must show that the defendant took advantage of his lack of knowledge and " 'that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated.' " *Id.* (quoting *Chastain v. Koonce,* 700 S.W.2d 579, 583 (Tex.1985)).

For the same reasons that support our conclusion that the Ventos' claims for fraud, intentional infliction of emotional distress, and tortious interference with prospective contractual relations must fail, there is no evidence that Bradford took advantage of Vento to a grossly unfair degree. Accordingly, the Ventos' claim under section 17.50 also fails.

### VII. Civil Conspiracy

In their petition for review, the Ventos contend that there is some evidence that Taylor, Bradford, Simon, and Golden Ring engaged in a civil conspiracy. The Ventos argue that Bradford and Taylor conspired to oust Vento from the store so that Taylor could sell Vento's property at the mall, and that Simon, Golden Ring, and Bradford later conspired to extort a release of liability from Vento. The court of appeals held that the evidence was legally insufficient to support a finding that Bradford and Taylor conspired to oust Vento from the store and

---

**5.** Although Vento did pay the December rent, he could not have been induced into paying that rent by Bradford's conduct on October 4 because he paid that rent after the events on October 6 and after he had already sued Bradford.

that there was legally insufficient evidence to support a finding that Bradford knew the November–December lease with Taylor was for an unlawful purpose. With regard to the alleged conspiracy among Simon, Golden Ring, and Bradford to extort a release of liability, the court of appeals held that the Ventos failed to produce any evidence that Simon and Golden Ring were separate entities, and accordingly, Bradford, Simon, and Golden Ring could not have conspired because Bradford was the agent of Simon and Golden Ring. 997 S.W.2d at 726–29. We agree with the court of appeals' analysis and judgment on this issue.

\*       \*       \*       \*       \*       \*

In sum, we hold that the evidence is legally insufficient to support a finding that Bradford, Simon, and Golden Ring committed fraud or engaged in a civil conspiracy. We further hold that the evidence is legally insufficient to support a finding that Bradford committed tortious interference with the Ventos' prospective contractual relations or violated the DTPA, and that, as a matter of law, Bradford's conduct was not extreme and outrageous. Accordingly, we affirm in part and reverse in part the court of appeals' judgment and render judgment that the Ventos take nothing from Bradford, Simon, and Golden Ring.