**Walter MILO and Anthony Shelton, Appellants,**

v.

**Guy MARTIN, Sandy Martin, Bill Cochran, Jr., and Melvin Douglas, Appellees.**

No. 09–09–00145–CV.

Court of Appeals of Texas, Beaumont.

Submitted Dec. 3, 2009.

Decided April 29, 2010.

Reginald E. McKamie, Sr., The Law Offices of Reginald E. McKamie, Sr., P.C., Houston, for appellants.

John Paul Hopkins, Hopkins Law Firm, Conroe, for appellees.

Before GAULTNEY, KREGER, and HORTON, JJ.

## OPINION

HOLLIS HORTON, Justice.

We are asked to consider whether the trial court erred in granting the appellees' no-evidence motion for summary judgment. We affirm.

### BACKGROUND

Plaintiffs, Walter Milo and Anthony Shelton, sued Guy Martin, Sandy Martin, Bill Cochran, Jr., and Melvin Douglas (collectively referred to as "The Watchdog") for actual and punitive damages related to The Watchdog's alleged publication on its website of several comments that Milo and Shelton contend were defamatory.[1] The derogatory comments that Milo and Shel-

---

1. The website that Milo and Shelton identified in their petition is no longer publically available (access attempted December 3, 2009–February 25, 2010). Copies of the pages containing the comments at issue are attached to Plaintiffs' First Amended Original Petition, the "live" pleading at the time the trial court decided the summary judgment motion. Also, Plaintiffs' First Amended Original Petition alleges that The Watchdog is both a newsletter and website. However, the defamatory statements at issue appeared on The Watchdog's website. Milo and Shelton presented no summary judgment evidence that The Watchdog published statements about them in its printed newsletter.

ton complain about were posted by anonymous[2] users to a portion of the website titled "Guest Book" during October 2006. After filing its original answer, The Watchdog filed a combined no-evidence and traditional motion for summary judgment. The Watchdog's no-evidence motion argues that section 230 of the Communications Decency Act of 1996 prevents a court from treating The Watchdog as having published the statements placed on its website by third parties. *See* 47 U.S.C.A. § 230 (West 2001).[3] Essentially, The Watchdog's no-evidence motion asserts that there is no evidence that The Watchdog created or developed the false and defamatory statements at issue.

Milo and Shelton filed a summary judgment response. To support their claims, their response included: (1) the affidavit of Milo; (2) a statement from Shelton;[4] (3) a copy of a medical report dated October 20, 2006, following Milo's office visit with his physician;[5] (4) a copy of the deposition of Sandy Martin; and (5) a copy of the deposition of Guy Martin.

Subsequently, the trial court granted The Watchdog's no-evidence motion for summary judgment. Milo and Shelton raise one issue in their appeal: "Whether the Communications Decency Act of 1996 shields from liability owners of a website from consequences of posting slanderous material if the website endorses and vouches for the truthfulness and veracity of the postings?"

### Standard of Review

This appeal requires that we consider the trial court's application of section 230 to Milo's and Shelton's claims. Matters of statutory construction are reviewed on appeal as questions of law under a de novo standard of review. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006).

The Watchdog's summary judgment motion, relying on section 230, contends that it did not publish the content about which Milo and Shelton complain. Section 230(c)(1) provides as follows:

Treatment of publisher or speaker

No provider or user of an interactive computer service[ [6] ] shall be treated as the publisher or speaker of any information provided by another information content provider.[ [7] ]

---

2. The comments at issue were posted by persons identified as "Jackie Helm" and "Jewell." The summary judgment evidence does not contain any further information on the identity of either "Jackie Helm" or "Jewell," and it does not contain any proof that "Jackie Helm" or "Jewell" were agents, servants, or employees of The Watchdog. Rather than assuming that persons named "Jackie Helm" or "Jewell" actually created the posts, and in the absence of further information that persons named "Jackie Helm" or "Jewell" created the posts, the opinion refers to the posts at issue as having been posted by anonymous users of the website.

3. See the historical and statutory notes ("1996 Amendments") to 47 U.S.C.A. § 609 (West 2001), for a list of the sections referenced as the "Communications Decency Act of 1996." Section 230 of the Act is the perti-

nent provision in this case. *See* 47 U.S.C.A. § 230 (West 2001).

4. Shelton's statement, although in the form of an affidavit, was not notarized.

5. The medical report contains no diagnosis and is not accompanied by a proper business records affidavit.

6. "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C.A. § 230(f)(2).

7. "The term 'information content provider' means any person or entity that is responsi-

47 U.S.C.A. § 230(c)(1). Section 230(e)(3) provides as follows:

(3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

47 U.S.C.A. § 230(e)(3). After reviewing the trial court's application of section 230, we then determine whether the trial court properly resolved The Watchdog's no-evidence motion for summary judgment.

We review a trial court's decision to grant a no-evidence motion for summary judgment under the standards set forth in Rule 166a(i) of the Texas Rules of Civil Procedure. To defeat a no-evidence summary judgment motion, the non-movant must produce summary judgment evidence that raises a genuine issue of material fact regarding each element of the claim that is challenged by the movant. TEX.R. CIV. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex.2004). The non-movant raises a genuine issue of material fact by producing "more than a scintilla of evidence" that establishes the challenged element's existence. *Ford Motor Co.*, 135 S.W.3d at 600. More than a scintilla of evidence exists when the evidence is such that reasonable and fair-minded people can differ in their conclusions. *Id.* at 601. If "'the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983)). In determining whether the non-movant has produced more than a scintilla of evidence, we re-

view the evidence in the light most favorable to the non-movant, and we give credit to such evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex.2006).

### Analysis

█ Under Texas law, the elements of a claim for defamation include proof that the defendant:

(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement.

*WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1988). By statute, libel is defined as follows:

A libel is a defamation expressed in written or other graphic form that tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury.

TEX. CIV. PRAC. & REM.CODE ANN. § 73.001 (Vernon 2005).

In this case, The Watchdog's no-evidence motion for summary judgment attacked an element of each of Milo's and Shelton's claims—whether The Watchdog could be treated as having "published" the statements at issue under Texas law.

ble, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C.A. § 230(f)(3).

Here, the alleged defamatory statements appeared on The Watchdog's internet website.[8] Therefore, section 230 impacts the question of whether The Watchdog "published" the statements at issue.[9]

■ Under Texas law, a person who repeats a defamatory statement made initially by another can be held responsible for republishing the libelous statement. *See Jacobs v. McIlvain*, 759 S.W.2d 467, 469 (Tex.App.-Houston [14th Dist.] 1988),[10] (quoting *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1289 (D.C.Cir. 1988)) (" 'The common law of libel has long held that one who republishes a defamatory statement 'adopts' it as his own, and is liable in equal measure to the original defamer.' "). While we note that newspapers and other periodicals have a statutory privilege that protects them against libel claims under certain defined circumstances, we further observe that The Watchdog's no-evidence motion does not assert a claim of privilege under the Texas Civil Practice and Remedies Code; therefore, we do not consider the statutory privileges created by Texas statute. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 73.002 (Vernon 2005).

Under the Restatement of Torts, the rule for republishers of defamatory content is stated as follows:

§ 578.   Liability of Republisher

Except as to those who only deliver or transmit defamation published by a third person, one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it.

RESTATEMENT (SECOND) OF TORTS § 578 (1977). Section 581 of the Restatement provides the following guidance with respect to those who merely transmit the defamation:

§ 581.   Transmission   of   Defamation Published by Third Person

(1) Except as stated in subsection (2), one who only delivers or transmits defamatory matter published by a third person is subject to liability if, but only if, he knows or has reason to know of its defamatory character.

(2) One who broadcasts defamatory matter by means of radio or television is subject to the same liability as an original publisher.

RESTATEMENT (SECOND) OF TORTS § 581 (1977).

■ To date, we find no Texas case addressing whether sections 578 and 581 of the Restatement Second of Torts represent a correct statement of defamation law in Texas. Nevertheless, regardless of the status of this state's defamation law that applies to republishers, deciding whether to treat an internet service provider's republication of a statement is largely controlled by section 230—a federal statute that "overrides the traditional treatment of publishers, distributors, and speakers un-

---

8.   We choose not to reprint the comments made by the persons who posted to The Watchdog's "Guest Book," as we have assumed for purposes of the summary judgment proceeding that the comments at issue were both false and defamatory and were the type of comments that would qualify as tending to injure the reputation of each appellant.

9.   As Milo and Shelton can prevail in this case only if there is evidence that The Watchdog "published" the posters' comments, we need not address all of the other grounds raised by The Watchdog's no-evidence motion for summary judgment. *See* TEX.R.APP. P. 47.1 (instructing that the opinion need only address issues necessary to final disposition of the appeal).

10.   The Texas Supreme Court reversed this case on other grounds at *McIlvain v. Jacobs*, 794 S.W.2d 14 (Tex.1990).

der statutory and common law." *Batzel v. Smith,* 333 F.3d 1018, 1026 (9th Cir.2003).

Section 230 evidences Congress's desire to protect online intermediaries from the potential liability that exists for providing users with access to content created by third parties. *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1123 (9th Cir.2003) ("Under the statutory scheme, an 'interactive computer service' qualifies for immunity so long as it does not also function as an 'information content provider' for the portion of the statement or publication at issue."); *Batzel,* 333 F.3d at 1020 ("Congress ... has chosen for policy reasons to immunize from liability for defamatory or obscene speech 'providers and users of interactive computer services' when the ... material is 'provided' by someone else.").

Although we find no reported Texas opinion that has addressed whether section 230 preempts Texas defamation law relating to situations involving internet service providers who provide access to defamatory third-party created content, federal courts have applied section 230 broadly in addressing how the statute operates to protect interactive computer services from suits based on an injury caused by the computer-service provider's making third-party-provided content publicly available on the internet. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157, 1167–68 (9th Cir.2008) (en banc) (defining the term "development" in 47 U.S.C.A. § 230(f)(3) "as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness"); *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.,* 519 F.3d 666, 671–72 (7th Cir.2008) (upholding summary judgment because section 230 prevented Craigslist from being held liable as a "messenger" of posts containing allegedly discriminatory sales and rental notices that pertained to housing); *Universal Commc'n Sys., Inc. v. Lycos, Inc.,* 478 F.3d 413, 416–22, 427 (1st Cir.2007) (affirming dismissal of claims against internet service provider that were based on defamatory posts by an anonymous user that appeared on the provider's message boards); *Carafano,* 339 F.3d at 1121–25 (finding no liability where website operator failed to review libelous content in user-created profiles to ensure that the content on the website was not defamatory); *Batzel,* 333 F.3d at 1022, 1027–28 ("Making interactive computer services and their users liable for the speech of third parties would severely restrict the information available on the Internet. Section 230 therefore sought to prevent lawsuits from shutting down websites and other services on the Internet."); *Green v. Am. Online (AOL),* 318 F.3d 465, 469, 471 (3rd Cir.2003) (holding that AOL could not be held liable for an alleged negligent failure to police its network for content provided by its users); *Ben Ezra, Weinstein, and Co., Inc. v. Am. Online, Inc.,* 206 F.3d 980, 984–85 (10th Cir.2000) ("47 U.S.C. § 230 creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party."); *Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir.1997) ("By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."). In section 230, Congress apparently made a choice "not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries[.]" *Zeran,* 129 F.3d at 330.

■ In this case, Milo and Shelton contend that The Watchdog acted as an information content provider because it

vouched for the accuracy of all of the information found on its website. If The Watchdog acted as a "content provider" under section 230, Shelton's and Milo's claims are not affected by section 230, since by definition its protection extends to providers or users of an interactive computer service, but not to an information "content provider." *See* 47 U.S.C.A. § 230(c)(1). Therefore, the question we must first decide is whether Milo and Shelton produced more than a scintilla of evidence to support their claim that The Watchdog is an information content provider with respect to the defamatory statements in issue.

■ Generally, an interactive computer service's failure to verify the content of material created by third parties does not make it the information content provider for the false or defamatory statements placed on the website by a third party. *See Prickett v. infoUSA, Inc.*, 561 F.Supp.2d 646, 651 (E.D.Tex.2006) (Failing to verify accuracy on a listing provided by a third party "does not remove this case from the immunity provided by § 230."); *Gentry v. eBay, Inc.*, 99 Cal.App.4th 816, 121 Cal.Rptr.2d 703, 717 n. 11 (2002) ("The critical issue is whether eBay acted as an information content provider with respect to the information that appellants claim is false or misleading."). Thus, The Watchdog's failure to verify the accuracy of the information in the posts in issue here does not, in itself, make the Watchdog the "information content provider" of the defamatory statements about which Shelton and Milo complain.

Additionally, we do not find any summary judgment evidence that the anonymous posters were The Watchdog's agents, servants, or employees, or any evidence that the anonymous posters obtained the subject matter of the anonymous posts from an owner or agent of The

Watchdog. Thus, the question the trial court decided is, in the absence of any proof of any legal relationship between the anonymous posters and The Watchdog, can The Watchdog still be considered as having been an "information content provider" with respect to the posts in issue? Milo and Shelton argue that The Watchdog can still be considered the information content provider because the first page of The Watchdog's website stated:

**The WATCHDOG**

*The unfiltered truth about Conroe politics and your tax dollars.*

*The Watchdog* is a monthly publication by newsletter and website. It contains facts believed to be totally accurate by sources with character and truthfulness as their primary attributes. Our agenda is the truth and nothing less. Our sources and any information obtained are absolutely confidential and will remain so.

Milo and Shelton argue that "[b]y vouching for the truthfulness of the third party statements[,] [The Watchdog] contributed to the development of the material and [is] therefore not immune [from] liability." In contrast, The Watchdog argues that it "had nothing to do with the creation or development of the alleged defamatory statements that form the basis of [Milo's and Shelton's] suit. The alleged defamatory statements were made by an anonymous third-party and the third party created, developed[,] and posted the content complained of."

Even when we consider the statements located on the first page of The Watchdog's website, we conclude that there is no summary judgment evidence tending to prove that The Watchdog, in whole or in part, created or developed the information contained within the anonymous posts. The representation that The Watchdog's website contains facts believed to be total-

ly accurate is simply not the same as a representation that all of the statements found anywhere within the website are accurate. Nor does the initial page of The Watchdog's website constitute a representation about the truthfulness of the posts that a user could find within the site's "Guest Book."

It would have been apparent to the ordinary user of The Watchdog's website that the "Guest Book" provided the website's users with opportunities for self-expression. A reasonable person, viewing the website as a whole, would be unlikely to assume that The Watchdog had verified the accuracy of the posts found in that portion of its site. In fact, one "Guest Book" post that is included in the record intensely criticized The Watchdog and accused it of being "mean and spiteful." The logical extension of Milo's and Shelton's argument is that the website's owner, by allowing the posting, had vouched for the accuracy of the derogatory claims made about The Watchdog. Given the existence of both favorable and unfavorable posts about The Watchdog's content, a reasonable reader of the site would not conclude that the posts within the "Guest Book" constituted views that were necessarily those that had been endorsed by The Watchdog.

We conclude that the posts within the "Guest Book" are statements that The Watchdog's readers would have attributed to the posts' authors. Nothing on the "Guest Book" pages of the site indicate that The Watchdog had investigated the information contained within the posts on that portion of the site, and there is nothing to indicate that The Watchdog had vouched for the truth of any of the statements within the "Guest Book" itself. Having reviewed the summary judgment evidence, we conclude there is no summary judgment evidence tending to prove that

The Watchdog could be considered as having been an information content provider with respect to the posts containing the defamatory content in issue. There is further no evidence that The Watchdog "developed" the posts, as that term was defined by *Fair Housing Council*, 521 F.3d at 1167–68, in which that court defined "development" "as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness."

We must address separately Milo's and Shelton's intentional infliction of emotional distress claim, as it is arguably not within the reach of the Communications Decency Act of 1996. *See* 47 U.S.C.A. § 230(c)(2) (containing proviso that providers are not to be held liable for actions voluntarily taken in good faith). Nevertheless, even if an intentional infliction claim is available as a remedy, a matter we need not decide, we conclude that Milo and Shelton produced no evidence to support claims based on a theory of intentional infliction of emotional distress. *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex.2005) (noting that "intentional infliction of emotional distress is a 'gap-filler' tort never intended to supplant or duplicate existing statutory or common-law remedies."). Thus, even if the gap were to be filled by the tort of intentional infliction of emotional distress, such a claim would still require evidence that (1) a person acted intentionally or recklessly, (2) the conduct was extreme and outrageous, (3) the conduct caused the plaintiff's emotional distress, and (4) the emotional distress was severe. *Bradford v. Vento*, 48 S.W.3d 749, 758 (Tex.2001). "Whether a defendant's conduct is 'extreme and outrageous' is a question of law." *Id.*

The summary judgment response of Milo and Shelton contains no evidence that The Watchdog intentionally or recklessly

left the posts on its site to cause Milo and Shelton to be injured, or that the "Guest Book" had been created in bad faith with an intent to injure persons mentioned in the posts. Instead, the only evidence in the summary judgment record shows that the posts in issue remained available through the "Guest Book" because The Watchdog's attorney advised the Martins to leave the posts up, as at that point, Shelton and Milo had already filed suit. With respect to their intentional infliction of emotional distress claims, we conclude that Milo and Hamilton presented the trial court with no summary judgment evidence supporting their claims that The Watchdog's failure to respond to the request by Milo's and Shelton's attorney to remove the anonymous posts amounted to extreme and outrageous conduct.

In summary, we hold, as a matter of law, that the statements on the first page of The Watchdog's website merely augment the content generally; the statements do not materially contribute to the alleged defamatory content placed on the site by the anonymous posters. We further hold that there was no summary judgment evidence that proved The Watchdog's failure to remove the anonymous posts constitutes extreme and outrageous conduct under the circumstances shown in the summary judgment record. We conclude that Milo and Shelton have failed to demonstrate on appeal that the trial court erred by granting The Watchdog's summary judgment motion.

Regardless of the grave potential that false and defamatory posts can have on the lives of its citizens, Congress apparently decided to prevent states from utilizing state libel law to impose liability on website providers when they republish false and defamatory content created and developed by third parties without the internet service provider's material involvement.

See 47 U.S.C.A. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."). Even if we preferred to apply the Texas common law rule to internet providers who republish defamatory material provided and created by third parties, the Supremacy Clause of the Constitution requires that a state court follow the laws passed by Congress when the Congress has expressed its intent to preempt state law. U.S. CONST. art. VI, cl. 2; *see also English v. Gen. Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (stating that "[p]re-emption fundamentally is a question of congressional intent, *see Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988), and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one"). We note our concern that section 230 does not provide a right to request a website's owner to remove false and defamatory posts placed on a website by third parties, and does not provide the injured person with a remedy in the event the website's owner then fails to promptly remove defamatory posts from its site, at least in the absence of extreme and outrageous circumstances that are not present here. Instead, Congress chose with only narrow exception to protect internet service providers from their potential liability for publishing false and defamatory content when that content is created by third parties and when the interactive computer service has not acted as an information content provider. Despite our concerns about section 230's breadth, the trial court did not err in applying section 230 to render summary judgment in this case. Therefore, we affirm the trial court's judgment.

AFFIRMED.

DAVID GAULTNEY, Justice, concurring.

While section 230 bars many causes of action, not every claim is barred. Specifically, the Act does not bar an intentional tort claim grounded on a defendant's alleged malicious conduct.

Nevertheless, because the plaintiffs produced legally insufficient evidence to support their intentional tort claim, I concur in the affirmance of the trial court's judgment. The record in this case establishes that the plaintiffs' request to remove the material was not made until after the lawsuit was filed. The defendants were then relying on the advice of their trial attorney, and, in response to the no-evidence motion for summary judgment, the plaintiffs produced legally insufficient evidence to support their intentional tort claim. The trial court therefore did not err in granting summary judgment.

## THE GROUNDS FOR SUMMARY JUDGMENT

A procedural issue complicates our review and ruling. The trial court's order granted summary judgment only on the no-evidence ground. The trial court did not rule on defendant's traditional motion for summary judgment based on immunity under section 230. The majority opinion therefore addresses section 230 as applicable to the no-evidence motion for summary judgment, and concludes the no-evidence motion was properly granted based on section 230. I respectfully disagree with this approach. Immunity under section 230 is an affirmative defense on which the defendant has the burden, and therefore is an improper ground for a defendant's no-evidence motion for summary judgment. *See* Tex.R. Civ. P. 166a(i); *see also Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir.2003) (section 230 immunity as affirmative defense).

The defendants presented a traditional motion for summary judgment based on section 230. A defendant may properly file a traditional motion for summary judgment based on an affirmative defense. *See Randall's Food Mkts. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995). When a trial court grants a final summary judgment disposing of all claims, an appellate court "may consider grounds that the trial court does not rule on in the interest of judicial economy." *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex.1996). Although the trial court did not rule on the traditional motion, the parties address section 230 in their briefs to this Court. Many of plaintiffs' claims are, as a matter of law, barred by section 230. In the interest of judicial economy, we may consider section 230, but not as the basis for the ruling on a defendant's no-evidence motion. If we are to address only the no-evidence motion, as the majority opinion does, we must simply decide whether any evidence supports plaintiffs' state law claims, without consideration of the affirmative defense of immunity; section 230 is irrelevant to the no-evidence motion.

There is some evidence to support plaintiffs' defamation claim, so a no-evidence motion could not be granted on that claim. The defamation claim is barred under section 230, however, because the defamation claim treats the defendants as publishers of information provided by a third-party. We should therefore consider the traditional motion in the interest of judicial economy and rule directly on the section 230 issue.

Because section 230 does not bar an intentional tort claim based on alleged malicious conduct, the question remains whether any evidence supports that state law claim. It is with respect to that claim—a claim not barred by section 230—

that the no-evidence motion for summary judgment should be considered.

## ANALYSIS

Congress enacted the Communications Decency Act in part to encourage removal of objectionable postings from websites. *See Fair Hous. Council v. Room-mates.com, LLC,* 521 F.3d 1157, 1175 (9th Cir.2008) (en banc). A malicious website operator—one who encourages anonymous postings and then intentionally and unreasonably refuses to remove a posting known to be defamatory and easily deleted—joins in the activity the Act was intended to discourage. "The Communications Decency Act was not meant to create a lawless no-man's-land on the Internet." *Id.* at 1164.

The Act should be read in the light of two cases that were decided before its enactment, because the Act was a response to the law at the time. *See* H.R.REP. No. 104–458, at 194 (1996) (Conf.Rep.) ("One of the specific purposes of [section 230] is to overrule [*Stratton Oakmont*] and any other similar decisions which have treated [interactive computer service] providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material.") *See Stratton Oakmont, Inc. v. Prodigy Servs. Co.,* 1995 WL 323710, 1995 N.Y. Misc. LEXIS 229 (N.Y.Sup.Ct., May 24, 1995). In *Cubby, Inc. v. CompuServe, Inc.,* 776 F.Supp. 135, 139 (S.D.N.Y.1991), CompuServe, an internet service provider, successfully argued that it was not a publisher of a third-party's defamatory posting, but rather was merely a distributor,

like a library or a book store. *See id.* at 140–41. However, another court subsequently rejected the argument that an internet service provider is simply a distributor and therefore not liable. *See Stratton Oakmont,* 1995 WL 323710, *2–3, 1995 N.Y. Misc. LEXIS 229, at *6–7. Unlike *CompuServe,* the court in *Stratton Oakmont* reasoned that Prodigy's voluntary efforts to remove objectionable postings from the internet meant it should be treated more like a newspaper than a library. *See id.* at *3, 1995 N.Y. Misc. LEXIS 229, at *7. Because of Prodigy's efforts, the court treated Prodigy like a publisher of a third-party's defamatory statement. *See id.* The two cases viewed together created a disincentive for providers to make any effort at removing defamatory material. Providers who did nothing were less likely to be held liable (treated as distributors) than providers who made good faith efforts to remove defamatory material (treated as publishers).

Congress responded with section 230 of the Communications Decency Act. *See* 47 U.S.C.A. § 230 (West 2001). The statute addresses the specific holding and the rationale in the *Stratton Oakmont* case by stating that

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

*Id.* § 230(c)(1). This language, along with a provision that bars a state law "inconsistent with this section," essentially nullified the holding in *Stratton Oakmont. See id.* § 230(c)(1),(e)(3).[1]

---

1. Some courts have read the word "publisher" in section 230(c)(1) to include a "distributor." *See Doe v. Am. Online, Inc.,* 783 So.2d 1010, 1017 (Fla.2001); *Zeran v. Am. Online, Inc.,* 129 F.3d 327, 332 (4th Cir.1997); *see* Samuel J. Morley, *Article: How Broad Is Web*

*Publisher Immunity Under § 230 of the Communications Decency Act of 1996?,* 84 FLA. B.J. 8 (Feb.2010). In my view, *Doe* and *Zeran* over-read section 230(c)(1), and do not give sufficient weight to the distinction between "publisher" (in a narrow sense) and "distrib-

The language of section 230(c)(2)(A) of the Act excepts bad faith conduct from immunity. Section 230(c)(2)(A) provides:

> Civil liability. No provider or user of an interactive computer service shall be held liable on account of—
>
> (A) any action voluntarily taken *in good faith* to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected[.]

*Id.* § 230(c)(2)(A) (emphasis added). This provision rejects the rationale applied in the *Stratton Oakmont* case. The Act essentially encourages a provider in a position like that of Prodigy to eliminate defamatory or otherwise objectionable material, and precludes civil liability for a provider's good faith (successful or unsuccessful) attempt to restrict access.

The word "action" in section 230(c)(2)(A) necessarily includes a good faith, but unsuccessful effort to delete defamatory or other objectionable material. Otherwise, immunity would be granted for a good faith, successful deletion of defamatory material, and yet not granted for a good faith, but unsuccessful effort to delete other defamatory material. Essentially, that would permit the rationale of *Stratton Oakmont* to survive in section 230(c)(2)(A), and arguably permit civil liability to be imposed when a provider attempts in good faith to restrict access to objectionable material, but fails. That result would seem contrary to the purpose of section 230. The Act apparently was intended to provide protection for the provider's good faith voluntary effort to remove a third-party's defamatory statement.

By its terms, section 230(c)(2)(A) protects an action taken in "good faith"—that is, with an absence of malice. A provider that acts maliciously, and that would be held civilly liable under state law, does not enjoy federal immunity under section 230(c)(2)(A). The Act would not confer immunity on a provider who maliciously deleted the "not" in the statement "she is not a thief." *See generally Roommates.com,* 521 F.3d at 1169 (applying section 230(c)(1)) ("[A] website operator who edits in a manner that contributes to the alleged illegality—such as by removing the word "not" from a user's message reading '[Name] did *not* steal the artwork' in order to transform an innocent message into a libelous one—is directly involved in the alleged illegality and thus not immune."). Similarly, a malicious provider who intentionally and unreasonably chooses not to remove material that can easily be deleted, and that is known to be defamatory, should not be immune from civil liability under section 230(c)(2)(A). The statute expressly provides that "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." 47 U.S.C.A. § 230(e)(3) (West 2001). A Texas law nonpublisher claim based on malicious conduct therefore may be asserted consistently with section 230.

Plaintiffs pleaded an intentional infliction of emotional distress claim. In my view, if a malicious website operator intentionally and unreasonably refuses to delete an anonymous third-party's obviously defamatory statement, a claim based on an intentional tort may be asserted in the appropriate circumstances against the operator under Texas law. The specific claim plaintiffs assert in this case, however, is a very narrow remedy. *See Tiller v.*

---

utor" described in the *Stratton Oakmont* case. Because that case inspired the language used

in the Act, the case should inform a court's reading of the Act.

*McLure,* 121 S.W.3d 709, 713–15 (Tex. 2003) (elements of claim for intentional infliction of emotional distress).

The narrow tort remedy plaintiffs assert may not be available, simply because the remedy is considered a "gap-filler" in Texas and the availability of another remedy "leaves no gap to fill." *See Creditwatch, Inc. v. Jackson,* 157 S.W.3d 814, 816 (Tex. 2005). Other remedies may exist under Texas law. Under certain circumstances, for example, a property owner may be held liable for defamatory material on his property that injures persons outside of the property. *See* RESTATEMENT (SECOND) OF TORTS § 364(c) (1965); § 577 cmt. p (1977). The Restatement explains the basis of civil liability of a property owner under appropriate circumstances as follows:

> The basis of the liability is his duty not to permit the use of his land or chattels for a purpose damaging to others outside of the land. Something of an analogy may be found in ... the duty to use reasonable care to remedy a condition upon the defendant's land created by another, which involves unreasonable danger to those outside of the land.

RESTATEMENT (SECOND) OF TORTS § 577 cmt. p. The Comment makes clear that liability is imposed on the property owner only for an intentional and unreasonable failure to remove material that may be easily removed, and that is known to be defamatory. *See id.* There may be circumstances under which the provider need do nothing to remove the third-party's defamatory statement; the property owner need not take "steps that are unreasonable if the burden of the measures outweighs the harm to the plaintiff." *Id.* But because the liability of a website operator for intentional action that injures another may be based on, and also limited by, the operator's control over the website material, the availability in Texas of a tort claim like

that described in the Restatement may preclude the exceptional "gap-filler" type remedy plaintiffs assert here. *See generally Creditwatch, Inc.,* 157 S.W.3d at 816 ("[I]ntentional infliction of emotional distress is a 'gap-filler' tort never intended to supplant or duplicate existing statutory or common-law remedies.").

The record demonstrates another—and in this case dispositive—restriction on the narrow claim plaintiffs assert in this case. The plaintiffs pleaded a cause of action for intentional infliction of emotional distress; although the claim is not barred by section 230 (because it is consistent with the Act), plaintiffs were required nevertheless to present evidence to support that claim in response to defendants' no-evidence motion for summary judgment. If a plaintiff proves that a website owner engaged in "extreme and outrageous conduct" that proximately caused plaintiff's severe emotional distress, and that no alternative remedy for the severe emotional distress exists, the website owner could be held liable under Texas law for the damages he causes. *See generally id.* (elements of claim for intentional infliction of emotional distress). To establish an intentional infliction of emotional distress claim under Texas law, however, a plaintiff must show the defendant's conduct was " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *See Tiller,* 121 S.W.3d at 713 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). In moving for summary judgment, defendants asserted plaintiffs had no evidence to support their claim for intentional infliction of emotional distress. Plaintiffs responded that the defendants failed to remove known defamatory material after plaintiffs requested the statements be taken down. Plaintiffs did not make their removal request until after the

lawsuit was filed, however. In response to the motion, plaintiffs presented the deposition testimony of one of the defendants acknowledging that, upon the advice of his trial attorney, he had not "retracted any of those statements[.]" Other than reliance on the trial lawyer's advice, no other specific evidence was presented explaining the reason for the failure to promptly remove the statements. Even should a court admit to a disagreement with the soundness of trial counsel's advice, reliance on that advice, by itself and without more, seems unlikely to be labeled "extreme and outrageous" conduct.

Because plaintiffs offered no legally sufficient evidence to support an intentional tort claim not otherwise barred by section 230, the trial court did not err in granting summary judgment. Although I cannot join the majority opinion, I concur in this Court's affirmance of the judgment.